In re FRANKLIN SAVINGS CORPORATION, Debtor.

FRANKLIN SAVINGS CORPORATION, Objecting Party and Counterclaim Plaintiff,

v.

FRANKLIN SAVINGS ASSOCIATION, Resolution Trust Corporation, Conservator, Counterclaim Defendants.

Bankruptcy No. 91–41518–11. Adv. No. 92–7053.

United States Bankruptcy Court, D. Kansas.

Sept. 15, 1993.

See also 150 B.R. 976.

R. Pete Smith of McDowell, Rice & Smith, Kansas City, MO, for Franklin Sav. Corp.

Michael R. Roser and Timothy K. McNamara of Lathrop & Norquist, Kansas City, MO, for Franklin Sav. Ass'n and its Conservator, the Resolution Trust Corp.

## MEMORANDUM OF DECISION

JOHN T. FLANNAGAN, Bankruptcy Judge.

The parties to this litigation are a corporate parent, Franklin Savings Corporation ("FSC"), and its subsidiary, Franklin Savings Association ("FSA"). The parent, FSC, is the debtor in bankruptcy. The subsidiary, FSA, is a stock savings and loan association chartered under the laws of the State of Kansas. FSA is represented in this proceeding by its FIRREA [1] Conservator, the Resolution Trust Corporation ("RTC"). Unless clarity requires otherwise, references to FSA in this opinion include the RTC.

Some background is necessary to an understanding of the detailed stipulations and factual findings that are to come.

On February 15, 1990, the Office of Thrift Supervision ("OTS"), in concurrence with the Commissioner of the Kansas Savings and Loan Department, found FSA to be a troubled and failed thrift and ordered the RTC appointed as Conservator of FSA to manage its assets. This regulatory ac-

---

1. Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. 101–73, 103 Stat. 183, Aug. 9, 1989.

tion spawned what the parties refer to as the "OTS Litigation," lawsuit challenging the legality of the appointment of the RTC as conservator of FSA filed by FSC on behalf of FSA in the United States District Court for the District of Kansas captioned *Franklin Sav. v. Office of Thrift Supervision*, 742 F.Supp. 1089 (D.Kan.1990). The Honorable Dale E. Saffels presided at a lengthy, highly publicized trial that examined the events leading to the FSA conservatorship. Judge Saffels found in favor of the plaintiff and made detailed findings of fact and conclusions of law based on evidence admitted at trial that was outside the OTS administrative record. The OTS appealed Judge Saffels' opinion to the Tenth Circuit Court of Appeals. The Court of Appeals reversed the District Court decision on the ground that the trial court should have limited the scope of its review to the administrative record of the OTS, rather than to admit evidence outside that record. To some degree, the plaintiff's evidence in this proceeding relating to the creation and operation of the tax agreements was also presented before Judge Saffels in the OTS Litigation. FSC contends that this Court should accept Judge Saffels' findings of fact on the tax agreements as the factual findings in this dispute.

Before the RTC was appointed Conservator of FSA in 1990, FSC and FSA operated under tax reimbursement and forgiveness agreements relating to their respective income tax liabilities. Under the agreements, FSC and FSA, along with various subsidiaries, filed consolidated federal income tax returns with FSC acting as the filing and collecting agent. The findings of fact will show that these tax agreements began between a corporation called Franklin Financial Corporation ("FFC") and FSA. Franklin Financial Corporation was the original holding company for FSA. On January 20, 1987, FSC was incorporated in the State of Kansas. FFC was then merged into FSC. The common stock of FFC was converted into common stock of FSC.

Following the conservatorship of FSA in February of 1990, FSC filed amended federal income tax returns using FSA's operating losses and received tax refunds totaling approximately $11,000,000.00. FSC placed these funds in interest-bearing government securities and notified the RTC of the refunds. FSA/RTC responded by claiming ownership of the tax refunds.

To resolve the dispute, FSC filed suit in the United States District Court for the District of Kansas on May 14, 1991, seeking a declaratory judgment entitling it to the refunds. This litigation is captioned *Franklin Savings Corporation v. Resolution Trust Corporation, as Conservator for Franklin Savings Association*, Case No. 91–4079–R, and is referred to by the parties as the "Tax Refund Litigation."

On July 26, 1991, FSC filed for Chapter 11 relief in this Court. FSA filed a Proof of Claim on December 4, 1991, and a First Amended Proof of Claim on February 28, 1992. Both proofs of claim alleged that FSC was liable to FSA for $11,206,010.00, plus interest ("Tax Refund Claim"). FSC objected to the proof of claim and filed a counterclaim to recover the money, thereby creating this adversary proceeding under Fed.R.Bankr.P. 3007. In its counterclaim, FSC seeks ownership of the tax refund proceeds and also contends that FSA holds only an unsecured claim under the terms of the tax agreements for amounts that "may be owing at some date in the future to the Internal Revenue Service for the benefit of FSA in the amount and subject to the credits to be determined by the Court."

There are several additional pieces of litigation involving FSC, FSA, the OTS, and the RTC pending in the United States District Court for the District of Kansas, either in Topeka or Kansas City, Kansas. These other lawsuits involve numerous claims and counterclaims for money among the parties that, if and when liquidated, may be filed as claims in this bankruptcy case.

On July 16, 1992, the RTC became the Receiver of FSA, displacing the RTC as

Conservator of FSA. Apparently, the objective of the receivership is to liquidate the assets of FSA.

Following the preparation of a pretrial order, the Court held a trial on September 16 and 17, 1992. Although in the adversary caption above FSA appears as the counterclaim defendant, at trial it proceeded first to support its proof of claim by presenting the testimony of Professor James Wheeler, Professor of Accounting, University of Michigan, and Christopher A. Cipriano, C.P.A., with Price Waterhouse, Kansas City, Missouri. FSC followed with the testimony of Duane Hall, Marc Woodward, and Ernest M. Fleischer. The Court received in evidence numerous exhibits offered by each party.

The parties have stipulated in the pretrial order that the Court has jurisdiction over the parties and subject matter of the action; that venue in this district is proper; that all necessary and indispensable parties are joined; and that the Court may try this adversary proceeding to final judgment. The Court finds independently of the stipulation that this adversary proceeding is core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984.

The parties have prepared and filed a stipulation of facts covering the amount and timing of the tax returns and refunds signed by R. Pete Smith on behalf of the debtor and by Michael R. Roser on behalf of RTC as Conservator of FSA, to wit:

## STIPULATION

Plaintiff and defendant, for the purpose of this proceeding, stipulate as follows:
1. Since 1985, FFC, FSC, FSA, and their respective subsidiaries and affiliates have elected to file Consolidated Federal Income Tax Returns under § 1501 of the Internal Revenue Code, utilizing a June 30 fiscal year.
2. FSC made none of the tax estimate payments which generated the tax refunds received by FSC.
3. Tax payments, deposits and credits of the Consolidated Group since 6/30/87 are as follows:

Since January 1, 1985, FSA has made the following estimated tax payments or deposits:

### 1. 1988 Tax Return (FYE June 30, 1988)

| Nature of Payment | Date | Method | Amount | Identification |
|---|---|---|---|---|
| Extension Tax Payment | 09/15/88 | Cash | $18,000,000 | Cancelled check to Peoples National Bank |

### 2. 1989 Tax Return (FYE June 30, 1989)

| | | | | |
|---|---|---|---|---|
| First Quarter Tax Estimate | 10/17/88 | Cash | $ 600,000 | Cancelled check to Peoples National Bank |
| Prior Year Credit Forward | 03/15/89 | Credit | $ 1,250,000 | Credit Forward |

### 3. 1990 Tax Return (FYE June 30, 1990)

| | | | | |
|---|---|---|---|---|
| Extension Tax Payment | 09/17/90 | Cash | $ 15,000 | Cancelled Check to Peoples National Bank |

### 4. 1991 Tax Return (FYE June 30, 1991)

| | | | | |
|---|---|---|---|---|
| 1st Qtr. Est. Tax Payment | 10/15/90 | Cash | $ 15,000 | FTD Coupon |
| 2nd Qtr. Est. Tax Payment | 12/15/90 | Cash | $ 1,605,000 | FTD Coupon |

### 5. 1992 Tax Return (FYE June 30, 1992)

| | | | | |
|---|---|---|---|---|
| Est. Tax Payment | 06/15/92 | Cash | $ 700,000 | FTD Coupon |

Since January 1, 1985, FSA subsidiaries and affiliates have made the following estimated tax payments or deposits:

### 1. 1989 Tax Return (FYE June 30, 1989)

| Nature of Payment | Date | Method | Amount | Identification |
|---|---|---|---|---|
| 1st Qtr. Est. Tax Payment | 10/17/88 | Cash | $ 650,000 | FTD Coupon (Paid By FSA*) Cancelled Check to Peoples National Bank |

| Nature of Payment | Date | Method | Amount | Identification |
|---|---|---|---|---|
| 2nd Qtr. Est. Tax Payment | 12/14/88 | Cash | $ 1,250,000 | FTD Coupon (Paid By FSA*) Cancelled Check to Peoples National Bank |
| 3rd Qtr. Est. Tax Payment | 09/13/88 | Cash | $ 12,000 | FTD Coupon (Paid By SLICA) Cancelled Check to IRS/United Missouri Bank |
| 4th Qtr. Est. Tax Payment | 12/15/88 | Cash | $ 15,000 | FTD Coupon (Paid By SLICA) Cancelled Check to Mark Twain Bank |

\* Payment was made by FSA but deposited under FSA Capital's I.D. #.

2. 1990 Tax Return (FYE June 30, 1990)

| Nature of Payment | Date | Method | Amount | Identification |
|---|---|---|---|---|
| FIHI overpayment of 1988 taxes (on separate tax return) | 09/13/89 | Credit | $ 300,000 | Credit Forward |
| Estimated Tax Payment | 12/15/89 | Cash | $ 35,000 | Cancelled Check to United Missouri Bank (Paid by FFI) |
| Estimated Tax Payment | 03/15/90 | Cash | $ 63,000 | Cancelled Check to United Missouri Bank (Paid by FIHI) |
| Estimated Tax Payment | 03/15/90 | Cash | $ 87,000 | Cancelled Check to United Missouri Bank (paid by SP & C) |
| Estimated Tax Payment | 03/16/90 | Cash | $ 710,000 | Cancelled Check to United Missouri Bank (Paid by FIHI) |
| Estimated Tax Payment | 06/14/90 | Cash | $ 121,000 | Cancelled Check to United Missouri Bank (Paid by SP & C) |
| Estimated Tax Payment | 06/13/90 | Cash | $ 627,233 | FTD Coupon (Paid by FIHI) Cancelled Check to United Missouri Bank |

3. 1991 Tax Return (FYE June 30, 1991)

| Nature of Payment | Date | Method | Amount | Identification |
|---|---|---|---|---|
| Estimated Tax Payment | 10/15/90 | Cash | $ 504,000 | FTD Coupon (Paid by FIHI) |
| Estimated Tax Payment | 12/15/90 | Cash | $ 660,000 | FTD Coupon (Paid by FIHI) |

| Payments Allocated to: | 10/15/90 | 12/15/90 |
|---|---|---|
| FSA Capital Tax ID # | $438,480 | $620,400 |
| FIHI Tax ID # | 65,520 | 39,600 |
| | $504,000 | $660,000 |

4. Tax Refunds:
  A. In February, 1989 FSC received a tax refund of $6,296,103 on its Consolidated Federal Tax Return for the F.Y.E. 6/30/88 which was subsequently reimbursed to FSA.
  B. In April, 1990, FSC received a federal tax refund in the sum of $2,377.00 which was subsequently reimbursed to FSA in August of 1990.
  C. On April 12, 1991 FSC received a tax refund check from the IRS in the amount of $1,952,145 on its Consolidated Federal Tax Return for the F.Y.E. 6/30/90. FSA supplied all of the funds which were used to make the tax payments which resulted in this refund.
  D. On May 15, 1991 the IRS wired to FSC's bank account net income tax refunds in the amount of $8,274,939.35 resulting from a series of amend-

ments to its Consolidated Federal Tax Return for F.Y.E. 6/30/88 as follows:

| Tax Form | Refund Claim | Description |
|----------|-------------|-------------|
| 1120X | $8,898,707 | NOL Carryback |
| 1120X | 151,399 | Amended Number 1 |
| | 87,966 | Amended Number 2 |
| | (775,553) | Amended Number 3 |
| | (140,837) | Interest on Number 3 |
| | 53,258 | Additional Interest on Number 3 |
| TOTAL | $8,274,940 | Year Ended June 30, 1988 |

FSA supplied all of the funds which were used to make the tax payments which resulted in this refund.

    E.   In May, 1992 FSC received a federal tax refund in the sum of $858,737.37 resulting from its Consolidated Federal Tax Return for the F.Y.E. 6/30/91. (The Consolidated Federal Tax Return sought a refund of $904,214 and it is believed that the IRS offset $45,476.63 as a result of monies it claimed had been erroneously refunded to FSC previously.) FSA supplied all of the funds which were used to make the tax payments which resulted in this refund.

5.   The refund proceeds received in April and May, 1991 and in May, 1992 all have been deposited in insured accounts of FSC or invested by FSC in obligations of the United States Government; FSC has had no income from any other sources during this same period of time other than interest earned on these funds or investments.

---

The most recent tax agreements, representative of those between the members of the consolidated group since 1985, are reproduced below:

### TAX REIMBURSEMENT AGREEMENT

#### (Revised)

This Revised Agreement is made and entered into as of the 30th day of June, 1988, by and between Franklin Savings Corporation, a Kansas corporation ("Parent") and Franklin Savings Association, a Kansas-chartered stock savings and loan association ("Franklin"), and terminates the Tax Reimbursement Agreement dated April 15, 1987. Further, this Revised Agreement retroactively adjusts, since July 1, 1985, amounts recorded in connection with the Tax Reimbursement Agreement dated April 15, 1987.

WITNESSETH:

WHEREAS, Parent owns in excess of 80% of Franklin's guaranty stock and Franklin owns 100% of the outstanding stock of various subsidiaries; and

WHEREAS, as a result of such common ownership, Parent and all of its eligible subsidiaries, including Franklin, ("Consolidated Group") have elected and consented to file and do file a consolidated Federal income tax return each year and, as a result, all such companies pay their taxes and otherwise report their income for Federal tax purposes on a consolidated basis with Parent serving as their agent for such purposes; and

WHEREAS, by operations of law, the Federal tax liability of Franklin is also a liability of Parent; and

WHEREAS, Parent and Franklin desire to document their understanding with respect to the reimbursement of taxes which would otherwise have been paid by Franklin had it not been a member of the Consolidated Group;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein set forth, the parties hereto do hereby agree as follows:

1. *Computation of Franklin's liability.* For each taxable year within which

this agreement is in effect and for which the Consolidated Group files a consolidated Federal income tax return in which any portion of Franklin's income, deductions or credits in [sic] included (herein "Consolidated Return Year"), Franklin shall prepare and present to Parent a computation of the provision for Federal income taxes to be used in preparing the consolidated financial statements of Franklin and its subsidiaries computed in accordance with generally accepted accounting principles (GAAP) on a pro forma basis as though Franklin and its subsidiaries were not members of the Consolidated Group. Franklin shall initially compute such liability monthly based upon monthly financial statements and shall make a final computation for each such year within ninety (90) days after the end of each Consolidated Return Year.

2. *Payment by Company.* Franklin shall pay to Parent the amount computed as its separate tax liability pursuant to paragraph 1 at such time as it would otherwise pay amounts owed to the Internal Revenue Service. Such payment shall be limited to the amount of income taxes actually payable by the Consolidated Group for the Consolidated Return Year plus the income tax benefit derived from any losses of Parent included in such consolidated return.

3. *Benefit from Losses or Excess Credits of Franklin.* If the computation in paragraph 1 above reflects a net operating loss or excess credits, then, at the time prescribed in paragraph 1, Franklin shall compute the provision for recovery of Federal income taxes (current and deferred), if any, and shall be entitled to (a) reimbursement by Parent, at the time prescribed in paragraph 2, to the extent of amounts previously paid to Parent or (b) if such recovery exceeds amounts previously paid to Parent, Franklin shall be entitled to credits against future amounts to be paid by Franklin to Parent pursuant to paragraph 2.

4. *Governing Law.* The provisions of this agreement shall be governed by and interpreted in accordance with the laws of the State of Kansas.

5. *Termination.* This agreement shall continue in effect until terminated by written agreement between the parties hereto.

6. *Successors.* This agreement shall be binding upon and inure to the benefit of any successor, by merger, acquisition of assets or otherwise, to any of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year first above written.

FRANKLIN SAVINGS CORPORATION

By /s/ Ernest M. Fleischer

FRANKLIN SAVINGS ASSOCIATION

By /s/ Duane H. Hall

### *AGREEMENT*

#### (Revised)

This Agreement is made and entered into as of the 30th day of June, 1988, by and between Franklin Savings Corporation, a Kansas corporation ("Parent") and Franklin Savings Association, a Kansas-chartered stock savings and loan association ("Franklin"), and terminates a previous agreement dated April 15, 1987.

WITNESSETH:

WHEREAS, Parent and Franklin have entered into a Revised Tax Reimbursement Agreement as of the 30th day of June, 1988: and

WHEREAS, Parent and Franklin desire to document further understandings between the companies with respect to the payment of taxes between themselves;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein set forth, the parties hereto hereby agree as follows:

1. *Contribution to Capital; Forgiveness of Indebtedness.* Prior to the end of each calendar quarter (or, at Parent's option, at the end of any month) in each

Consolidated Return Year, Parent shall determine the amount, if any, of the amount due from Franklin as a result of the Revised Tax Reimbursement Agreement which Parent desires to forgive as of the end of such quarter (or month) as a contribution to the capital of Franklin. Parent shall promptly notify Franklin of the amount of such forgiveness and contribution to capital, or, if no such forgiveness and contribution is made, Parent shall notify Franklin that no such forgiveness and contribution shall be made. Franklin shall be relieved of the amount of any such tax liability otherwise owing to Parent pursuant to the Revised Tax Reimbursement Agreement which is specifically forgiven and contributed to Franklin's capital by Parent and such amounts shall be considered paid. Any liability for such income taxes forgiven under the terms of this Agreement shall be and remain a liability of Parent to the extent any such amounts are ultimately owing to taxing authorities by Parent or any member of the Consolidated Group. So long as there is any liability owing by Franklin to Parent for income taxes, any amount required to be paid to the Internal Revenue Service on account of Franklin shall be paid from Franklin to Parent.

2. *Benefits from Losses or Excess Credits.* In the event of losses and/or excess credits of Franklin resulting in a benefit as described in the Revised Tax Reimbursement Agreement, such amounts shall reduce any liability owed by Franklin to Parent.

3. *Record.* The amount of the contributions to capital and forgiveness described in paragraph 1 hereof shall be established by resolution of the board of directors of Parent and shall specifically forgive the liability of Franklin, if any such liability is forgiven, and shall state the amount of such forgiveness. A copy of each such resolution establishing such forgiveness and contribution, or establishing that no such forgiveness and contribution shall be made, shall be delivered to Franklin.

4. *Governing Law.* The provisions of this agreement shall be governed by and interpreted in accordance with the laws of the State of Kansas.

5. *Termination.* This agreement shall continue in effect until terminated by written agreement between the parties hereto.

6. *Successors.* This agreement shall be binding upon and inure to the benefit of any successor, by merger, acquisition of assets or otherwise, to any of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year first above written.

FRANKLIN SAVINGS CORPORATION

By /s/ Ernest M. Fleischer

FRANKLIN SAVINGS ASSOCIATION

By /s/ Duane H. Hall

### *FINDINGS OF FACT*

1. After hearing the testimony, examining the Stipulation of the parties and the exhibits, and reviewing the briefs and suggested findings of fact filed by the parties, the Court makes the following findings of fact numbered 1 through 115, inclusive. The findings of fact numbered 1 through 53 are based on defendant FSA's suggested findings of fact and DEFENDANT'S EX. N. in evidence. DEFENDANT'S EX. N. consists of 365 admission statements made by plaintiff in response to defendant's requests for admissions.

2. Franklin Savings Corporation is the holding company for Franklin Savings Association. FSA is a stock savings and loan association chartered under the laws of the State of Kansas, which has numerous subsidiaries. FSC owns more than 92 percent of the issued and outstanding stock of FSA. [DEFENDANT'S EX. N, Nos. 1, 2, 3, Responses to Defendant's Requested Admissions]

3. Franklin Financial Corporation was incorporated on March 11, 1975; from March 11, 1975, to January 20, 1987, FFC was the holding company for FSA. On

January 20, 1987, FSC was incorporated in the State of Kansas. FFC was then merged into FSC and its common stock was converted into common stock of FSC. [DEFENDANT'S EX. N, Nos. 6, 7, 8, 9]

4. The various tax agreements dated "as of" April 15, 1987, and "as of" June 30, 1988, were executed by Ernest M. Fleischer on behalf of FSC and Duane H. Hall on behalf of FSA. [DEFENDANT'S EX. A, B, C]

5. FSC's original Board of Directors was composed of six individuals: J. Raymond Barmby, Harry T. Coffman, Ernest M. Fleischer, Mary Louise Greene, Duane H. Hall, and Glenn O. McGuire. [DEFENDANT'S EX. N, No. 10]

6. At a special meeting on November 18, 1987, the FSC Board of Directors increased its size from six to seven members. Also on November 18, 1987, FSC shareholders re-elected the six original directors and elected John A. Scowcroft as a seventh member of the FSC Board of Directors. [DEFENDANT'S EX. N, Nos. 11, 12]

7. At the annual meeting on November 29, 1989, FSC shareholders re-elected the seven existing directors named in paragraphs 5 and 6 and elected two new directors: Barbara J. Fleischer and Ted H. Greene, Jr. [DEFENDANT'S EX. N, No. 13]

8. On February 14, 1990, the FSC Board of Directors accepted the resignations of Board members J. Raymond Barmby, Harry T. Coffman, Mary Louise Greene, Glenn O. McGuire, Ernest M. Fleischer and Duane H. Hall, and resolved to reduce the number of directors from nine to three members. From February 14, 1990, to February 26, 1990, the only directors of FSC were: Barbara J. Fleischer, Ted W. Greene, Jr., and John A. Scowcroft. [DEFENDANT'S EX. N, Nos. 15, 16, 17, 18, 19, 20, 21]

9. On February 26, 1990, the FSC Board of Directors voted to increase its size from three to five members and elected Ernest M. Fleischer to the Board of Directors. The FSC Board also elected Ernest M. Fleischer as Chairman of the Board and Chief Executive Officer of FSC. [DEFENDANT'S EX. N, Nos. 22, 24, 25, 26]

10. On November 21, 1990, FSC stockholders re-elected the existing four directors: Ernest M. Fleischer, Barbara J. Fleischer, Ted H. Greene, Jr., and John A. Scowcroft, and additionally elected Pamela Fleischer to the Board. [DEFENDANT'S EX. N, No. 27]

11. On July 25, 1991, Barbara J. Fleischer, Ted H. Greene, Jr., and Pamela Fleischer resigned from the FSC Board of Directors. Since July 25, 1991, Ernest M. Fleischer and John A. Scowcroft have been the only members of the FSC Board of Directors. [DEFENDANT'S EX. N, Nos. 28, 30]

12. J. Raymond Barmby, Harry T. Coffman, Ernest M. Fleischer, Mary Louise Greene, Duane H. Hall and Glenn O. McGuire served continuously on the FSC Board of Directors from September 26, 1985, when they were named in the Articles of Incorporation, until they resigned on February 14, 1990. [DEFENDANT'S EX. N, No. 31]

13. From January 20, 1986, to the present, except for the 12–day period between February 14 and February 26, 1990, Ernest M. Fleischer has continuously served on the FSC Board of Directors and has been Chairman of the FSC Board of Directors. [DEFENDANT'S EX. N, Nos. 32, 33]

14. John A. Scowcroft has served continuously on the FSC Board of Directors from November 18, 1987, to the present; he was vice-chairman of the FSC Board of Directors from November 18, 1987, until his resignation on February 14, 1990. [DEFENDANT'S EX. N, Nos. 34, 35]

15. Barbara J. Fleischer served on the FSC Board of Directors from November 29, 1989, until July 25, 1991; she was Chairman of the FSC Board of Directors for 12 days, from February 14 to February 26, 1990. [DEFENDANT'S EX. N, Nos. 36, 37]

16. Ted H. Greene, Jr. served on the FSC Board of Directors from November 29,

1989, until July 25, 1991. [DEFENDANT'S EX. N, No. 38]

17. FSC's original officers were:

| Officer | Title |
|---|---|
| Duane H. Hall | President and Chief Executive Officer |
| Lawrence H. Kramer | Senior Vice President and Secretary |
| Dennis J. Katzer | Executive Vice President Chief Financial Officer and Treasurer |
| Jerry E. Mayne | Executive Vice President and Chief Administrative Officer |

[DEFENDANT'S EX. N, No. 39]

18. On January 21, 1987, the FSC Board of Directors elected two additional officers:

| Officer | Title |
|---|---|
| Ernest M. Fleischer | Chairman of the Board |
| Marc C. Woodward | Controller and Chief Accounting Officer |

[DEFENDANT'S EX. N, No. 40]

19. At its annual meeting on November 18, 1987, the FSC Board of Directors re-elected all of the officers identified in paragraphs 17 and 18 to the positions set forth above. [DEFENDANT'S EX. N, No. 41]

20. At its annual meeting on November 29, 1989, the FSC Board of Directors re-elected all of its existing officers set forth above, along with: Ted H. Greene, Jr., Senior Vice President, and William J. Marshall, Senior Vice President. [DEFENDANT'S EX. N, No. 42]

21. On February 14, 1990, all FSC officers resigned their respective positions at which time the FSC Board elected the following officers: Barbara J. Fleischer, Chairman of the Board; John A. Scowcroft, President; and Ted H. Greene, Jr., Secretary and Treasurer. [DEFENDANT'S EX. N, Nos. 43 and 52]

22. At its annual meeting on November 21, 1990, the FSC Board of Directors elected the following officers: Ernest M. Fleischer, Chairman of the Board; John A. Scowcroft, President; Ted H. Greene, Jr., Secretary and Treasurer. [DEFENDANT'S EX. N, No. 53]

23. On July 25, 1991, the FSC Board of Directors elected the following officers: Ernest M. Fleischer, Chairman of the Board and Secretary; John A. Scowcroft, President and Treasurer. [DEFENDANT'S EX. N, No. 57]

24. As of February 25, 1992, the shareholders of FSC were as follows:

| Name | No. of Shares | % of Total |
|---|---|---|
| Ernest M. Fleischer | 12,666,600 | 27.8117 |
| Barbara Jean Fleischer, Trustee for Elizabeth Fredkin | 18,450 | .0405 |
| Barbara Jean Fleischer, Trustee for Judith Fleischer | 18,450 | .0405 |
| Ernest W. Fleischer | 9,450 | .0207 |
| Pamela Fleischer | 9,450 | .0207 |
| ABER & CO. (Mary Louise Greene) | 18,854,100 | 41.3937 |
| James T. Lacy and Lois Ann Lacy, Trustees | 452,250 | .9930 |
| Paul LaForge | 452,250 | .9930 |
| Angell Trust of 1985 (Wiley Angell, Trustee) | 145,818 | .3202 |
| Charlie L. Angell | 72,909 | .1601 |
| Howard I. Fleischer | 18,227 | .0400 |
| Barbara J. Fleischer and Pamela Fleischer, Co-Trustees for Ernest W. Fleischer | 6,361,200 | 13.9671 |
| Barbara J. Fleischer and Ernest W. Fleischer, Co-Trustees for Pamela Fleischer | 6,361,200 | 13.9671 |
| Ruthann C. Koger Trust | 103,895 | .2281 |
| Subtotal | 45,544,249 | 100.00% |

Treasury Stock—23,695 shares

[DEFENDANT'S EX. N, No. 58]

25. Since 1985, FSC and its predecessor FFC, FSA, and their respective subsidiaries and affiliates have elected to file consolidated federal income tax returns under § 1501 of the Internal Revenue Code with a June 30 fiscal year end. [DEFENDANT'S EX. N, Nos. 59 and 60]

26. For each fiscal year since 1985, FSC (or its predecessor, FFC) has filed a consolidated federal income tax return on behalf of the Consolidated Group of related Franklin entities. [DEFENDANT'S EX. N, No. 61]

27. To the extent that FSC filed claims and received payments of income tax refunds attributable to the Consolidated Group under Treasury Regulation § 1.1502–77(a) (and under the Tax Agreements), it did so as agent for the members of the Consolidated Group. [DEFENDANT'S EX. N, No. 63]

28. FSC did not make any of the tax estimate payments which generated the 1988, 1990, or 1991 tax refunds of the Consolidated Group. Nor did FSC generate losses which resulted in the tax refunds. [DEFENDANT'S EX. N, Nos. 68, 69 and 70]

29. Before the June 30, 1988, tax agreements went into effect, substantially similar tax agreements, dated April 15, 1987, were in effect between FSC and FSA. [DEFENDANT'S EX. N, Nos. 76, 77, 78]

30. On January 23, 1987, the FFC Board of Directors, as owner of 95 percent of the guaranty stock of FSA, authorized FFC to enter into certain tax agreements (attached as exhibits to the FFC Board resolution). [DEFENDANT'S EX. N, No. 114]

31. Shortly after June 30, 1987, FSC filed with the Federal Savings and Loan Insurance Corporation ("FSLIC"), pursuant to § 408(b)(2) of the National Housing Act, as amended, its Annual Report H–(b) 11 for the fiscal year ended ("FYE") June 30, 1987. [DEFENDANT'S EX. N, No. 118]

32. The FSLIC June 30, 1987, report states in part:

In connection with a Tax Reimbursement Agreement between the Company [FSC] and the Association [FSA], the Association records a provision for federal income taxes currently payable to the Company based upon regulatory basis income. Under a related stock issuance agreement, the Company has forgiven a portion of the indebtedness of the Association relating to income taxes, and 2,784,250 shares of the guaranty stock of the Association were purchased at par value by the Company. On June 30, 1987, the Association canceled the shares and refunded the purchase price to the Company. In connection with this cancellation, the Company attributed a gain to the minority shareholders of $15,106 which represents the difference between the book value of the guaranty stock of the Association at the date of cancellation and the repurchase price.

[DEFENDANT'S EX. N, No. 119]

33. Shortly after June 30, 1988, FSC filed with the FSLIC pursuant to § 408(b)(2) of the National Housing Act, as amended, its Annual Report H–(b) 11 for the fiscal year ended June 30, 1988. [DEFENDANT'S EX. N, No. 120]

34. During the fiscal year ended June 30, 1988, FSC and FSA adopted the Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes" [FAS 96]. [DEFENDANT'S EX. N, No. 121]

35. The FSLIC June 30, 1988, report states that the adoption of FAS 96 had the following effect on FSC:

This change, which was made effective as of July 1, 1987, results in a reduction of $7,671 of the amount which had been provided for deferred income taxes in the past relating to timing differences between income for financial reporting purposes and income for income tax purposes. The effective tax rate without

consideration of the accumulative effect of SFAS [sic] 96 would have been 36.1%. [DEFENDANT'S EX. N, No. 123]

36. The FSLIC June 30, 1988, report also states:

In connection with a Tax Reimbursement Agreement between the Company [FSC] and the Association [FSA], the Association records a provision for federal income taxes currently payable to the Company based upon regulatory basis income. Under a related stock issuance agreement, the Company has forgiven a portion of the indebtedness of the Association relating to income taxes, and 2,784,-250 shares of the guaranty stock of the Association were purchased at par value by the Company. On June 30, 1987, the Association canceled the shares and refunded the purchase price to the Company. In connection with this cancellation, the Company attributed a gain to the minority shareholders of $15,106 which represents the difference between the book value of the guaranty stock of the Association at the date of cancellation and the repurchase price.

[DEFENDANT'S EX. N, No. 124]

37. Shortly after June 30, 1990, FSC filed with the FSLIC, pursuant to § 408(b)(2) of the National Housing Act, as amended, Annual Report H–(b) 11 for the fiscal year ended June 30, 1990. [DEFENDANT'S EX. N, No. 125]

38. The FSLIC June 30, 1990, report made the following statement with respect to taxes:

Item 10. Taxes.

The Registrant files a consolidated federal tax return. The Registrant and Franklin Savings Association have entered into two agreements relating to the payment of taxes. One agreement provides that the Association will pay the Registrant an amount equal to any federal income taxes attributable to the Association payable with respect to a consolidated return filed by the Registrant. The second agreement provides that the Registrant will forgive the Association's obligation to pay those taxes as a contribution to the Association's capital.

During the fiscal year under report, the insured institution did not pay to the Registrant any funds for purposes of income tax payments.

[DEFENDANT'S EX. N, No. 126]

39. "Deferred income taxes" is an accounting concept which is calculated for temporary differences between the financial reporting basis and the tax basis of a company's assets and liabilities. [DEFENDANT'S EX. N, No. 139]

40. During the three-year period ended June 30, 1988, FSC forgave income taxes receivable from FSA totaling approximately $120.7 million under the terms of the tax forgiveness agreement in place between the parties. [DEFENDANT'S EX. N, No. 141]

41. In connection with FSC's forgiveness of FSA's tax liability, FSC purchased 2,784,250 shares of FSA guaranty stock at par value, prior to the 10–for–1 stock split. [DEFENDANT'S EX. N, No. 142]

42. FSA later canceled the shares (after the stock split) and refunded the purchase price to FSC on June 30, 1987. [DEFENDANT'S EX. N, No. 143]

43. After December 1987, under a stock issuance agreement between FSC and FSA, FSA was to issue shares of FSA guaranty stock to FSC at the time federal income tax payments were payable by FSA. [DEFENDANT'S EX. N, No. 144]

44. On February 15, 1990, pursuant to OTS Order No. 90–368 (concurred in by the Commissioner of the Kansas Savings and Loan Department), the OTS appointed the RTC the Conservator of FSA. [DEFENDANT'S EX. N, Nos. 171, 252]

45. On February 16, 1990, the RTC as Conservator of FSA assumed control of FSA. The RTC is an instrumentality of the United States created pursuant to 12 U.S.C. § 1441a(b) of FIRREA to conserve, manage and resolve the assets of troubled and failed thrift institutions. [DEFENDANT'S EX. N, Nos. 172, 173, 258]

46. On May 14, 1991, FSC brought an action in the United States District Court for the District of Kansas, captioned *Franklin Savings Corp. v. Resolution Trust Corporation, as Conservator for Franklin Savings Association,* Case No. 91–4079–R ("Tax Refund Litigation"). [DEFENDANT'S EX. N, No. 228]

47. On July 25, 1991, the FSC Board of Directors authorized and directed FSC officers to file a petition for relief under Chapter 11 of the United States Bankruptcy Code. [DEFENDANT'S EX. N, No. 230]

48. On February 28, 1992, the Conservator filed its First Amended Proof of Claim in this proceeding, asserting a right to $11,206,010 in tax refund proceeds. [DEFENDANT'S EX. N, No. 232]

49. On April 15, 1992, FSC filed its Answer and Objection to the First Amended Proof of Claim, and commenced an adversary action to recover money or property from the Conservator. In the adversary, FSC claims that it owns the tax refund proceeds and that the Conservator has only an unsecured claim under certain tax agreements between FSC and FSA for amounts that "may be owing at some date in the future to the Internal Revenue Service for the benefit of FSA in the amount and subject to the credits to be determined by the Court." [Objection and Counterclaim Complaint, ¶ 8] [DEFENDANT'S EX. N, No. 235]

50. Prior to 1987, FFC, FSC's predecessor, was the parent of FSA.

51. Until 1985, a savings and loan association ("S & L") was required to maintain capital in an amount not less than 3 percent of its average liabilities for the five preceding years. [PLAINTIFF'S EX. 1] Thus, in 1984, for example, FSA was required to have capital equal to 3 percent of its average liabilities during 1979–1983. By pegging the capital requirement to the size of the institution during the prior five years, an S & L was permitted to acquire assets and earn the required capital for that asset growth over a five-year period commencing with the date that the assets were acquired.

52. In November, 1984, FSA issued $2.9 billion in 30–35–40–year Zero Coupon Bonds for approximately $68 million in current cash. The bonds were required to be collateralized with mortgage-backed securities, U.S. Treasury or Agency obligations. Mortgage-backed securities yield more than the other permitted collateral. Accordingly, FSA used mortgage-backed securities as collateral. The Zero Coupon Bonds provided that they would be in "default" in the event FSA failed to meet its capital compliance requirements. In the event of a "default," FSA was required to purchase U.S. Treasury or certain Agency obligations in an amount that would, at maturity, pay off the Zero Coupon Bonds. [PLAINTIFF'S EX. 2] If such a "default" were to occur and, as a result, the purchase of such obligations would be required, FSA would have suffered millions of dollars of loss, represented by the present value of the market yield between mortgage-backed securities and such obligations for the remaining 30–35–40–year term of the bonds.

53. In 1985, the regulatory capital rules changed. Under the new rules, an S & L was required to have 3 percent capital in place for any future growth. In addition, if, at the end of 1985, the institution did not have capital equal to 3 percent of its 1985 average liabilities, it was required to make up the shortage over a five-year period [at the rate of 20 percent of the deficiency each year]. [PLAINTIFF'S EX. 3]

54. Although FSA was in compliance with the old rules and projected to be in compliance under the new rules, FSA officials were very concerned about the new rules requiring higher capital because of the extreme economic penalty the institution would suffer if the Zero Coupon Bonds went into default as a result. Accordingly, FSA officials were desirous of providing an additional capital "cushion" to avoid default.

55. In the fall of 1985, Ernest M. Fleischer [Chairman of the Board of FFC and FSA] developed a plan to have FFC provide an additional capital cushion for FSA. The capital was to be provided by (i) FSA paying FFC its tax liability under

generally accepted accounting principles ("GAAP"), (ii) FFC buying additional capital stock in FSA equal to the difference between the GAAP tax liability and the actual tax liability due on the consolidated income tax return of the parties (the "deferred taxes"), and (iii) FFC assuming the liability to the IRS for the deferred taxes. The logic underlying the plan was as follows:

a. FSA computed its tax liability on the basis of GAAP, but was included in a consolidated return showing a lesser tax liability under income tax accounting. The difference was established as a "liability" on FSA's books under the heading "deferred taxes."

b. In the absence of a liquidation of FSA, the "deferred taxes" would continue to roll forward and would not become due and owing.

c. If FSC were to assume FSA's liability for the deferred taxes and "forgive" FSA's liability to pay them, the result would be an injection of capital by FSC.

d. One of three scenarios could happen with respect to the deferred taxes:

(1) They would continue to be accrued but never become payable;

(2) FSA would suffer losses, thereby reducing the liability for deferred taxes; or

(3) In the event the character of FSA's income changed and the deferred taxes became payable, there would be accompanying realized profits, increasing the economic value of FFC's stock in FSA and FFC would be able to raise money to pay the taxes based on that increase in the value of its subsidiary's stock.

e. No risk to the deposit insurance fund could occur, since if FSA did become insolvent, it would be exempt from tax payment pursuant to § 7507 of the Internal Revenue Code, which provides an exemption from tax for insolvent banks. In Rev.Rul. 88–18, 1988–1 C.B. 402, the Internal Revenue Service, citing The Depositary Institutions Deregulation and Monetary Capital Act of 1980, Pub.L., No. 96–221, 94 Stat. 132, determined that S & Ls come "within the meaning of the term 'bank or trust company' as used in Section 7507 of the Code."

56. At that time (1985), FSA was regulated by the Federal Home Loan Bank of Topeka ("FHLB"), among others.

57. In the spring of 1985, Mr. Fleischer discussed with Dave Douglass, the supervisory agent with the FHLB responsible for FSA, a similar idea using subordinated debentures. Duane H. Hall, President of FSA, had subsequent conversations relating to the tax forgiveness/capital plan with Dick Fischman, a Vice President of the FHLB, in the fall of 1985.

58. Mr. Fischman advised Mr. Hall to determine whether FSA's independent auditors would approve of the plan and, if so, to submit the request in writing to the FHLB.

59. Mr. Hall requested that Deloitte Haskins & Sells opine on the intended tax forgiveness transactions to determine whether the intended result of increasing the capital of FSA would meet the requirements of GAAP. On December 9, 1985, Deloitte Haskins & Sells issued its opinion that the transactions would, in fact, qualify as an increase of FSA's capital under GAAP. [PLAINTIFF'S EX. 4]

60. On December 11, 1985, acting on behalf of FSA, Mr. Hall submitted the outside auditors' opinion and the request for approval of the contemplated tax transactions to Mr. Fischman of the FHLB. [PLAINTIFF'S EX. 5]

61. FFC and FSA entered into a Tax Reimbursement Agreement as a part of the above plan.

62. Subsequently, and as part of the plan to provide FSA a capital cushion, FSC "forgave" the deferred taxes FSA owed it under GAAP. In exchange for the liability which FSC forgave, FSA issued FSC capital stock.

63. FSA filed its audited financial statements for 1985 and 1986 disclosing the additional capital generated through operation of the tax agreement and the above plan. [PLAINTIFF'S EX. 6 and 7]

64. In 1987, FSC and FSA changed the method by which FSC would contribute

capital to FSA as a result of the tax agreements. Instead of issuing FSC capital stock in FSA for the forgiven liability, FSC and FSA treated the amount of the forgiven deferred tax liability as a "contribution of capital" from FSC to FSA. The new agreements generally called for the following:

a. Under the new "Tax Reimbursement Agreement" [PLAINTIFF'S EX. 8], FSA was obligated to compute its tax liability based on Regulatory Accounting Practices ("RAP"). FSA was obligated to pay FSC the amount computed as its separate liability under RAP, but this payment was *limited to* (i) the amount of taxes actually payable by the Consolidated Group, plus (ii) the income tax benefit derived from any losses of FSC included in such Consolidated Return.

b. An additional "Agreement" was entered into on the same day (the "Tax Forgiveness Agreement") [PLAINTIFF'S EX. 9]. Under the Tax Reimbursement Agreement, FSC would notify FSA of the amount of the deferred taxes due from FSA to FSC which FSC would "forgive." The resulting forgiveness would be "a contribution to the capital of" FSA.

65. This actually resulted in an economic disadvantage to FSC as compared to the minority stockholders in FSA. Under the Tax Forgiveness Agreement, every dollar FSC would "forgive" would result in a dollar of additional capital for FSA, but only $.94 of that additional capital would inure to the benefit of FSC, with the balance inuring to the benefit of FSA's minority shareholders.

66. On June 30, 1988, the tax agreements were once again revised. The revised agreements changed FSA's requirement to compute its taxes under RAP to the requirement to compute them under GAAP. Otherwise, the agreements were the same and are the same agreements that are presently in force. [PLAINTIFF'S EX. 10 & 11]

67. FSA's audited financial statements filed with the FHLB for fiscal years ended June 30, 1987, June 30, 1988, and June 30, 1989, showed the additional capital generated through the tax agreements. [PLAINTIFF'S EX. 12A, 12B, 12C]

68. In addition, statements FSA filed with the FHLB from 1986 through 1989 disclosed the recordation of FSA capital through operation of the tax agreements for the purposes of FSA's growth plans. [PLAINTIFF'S EX. 14]

69. FSA did not utilize the capital resulting from the tax forgiveness either to (i) support growth, or (ii) pay dividends to its stockholders. To the contrary, prior to FIRREA, FSA's excess Regulatory Capital always exceeded the amount of the capital represented by the tax forgiveness. [PLAINTIFF'S EX. 15A & 15B]

70. Mr. Hall did not receive a formal, written response to his December 11, 1985, letter to the FHLB [PLAINTIFF'S EX. 5]; however, that was not unusual since the practice with the FHLB was that FSA could deem a request granted unless the FHLB notified FSA that it objected to the request.

71. On May 19, 1989, Darrell Dochow of the Office of Regulatory Activities of the Federal Home Loan Bank System in Washington, D.C., issued a memorandum to the various Directors of Agency Functions regarding "Tax Sharing Agreements." [PLAINTIFF'S EX. 16] The memo attaches a new section of the holding company handbook discussing the policy and issues procedural guidance to examiners regarding tax sharing agreements.

72. The principal thrust of the memorandum and the attached draft of the holding company manual is to insure that the association does not pay its parent more than it would have to pay the IRS if it filed a separate return. The FSA/FSC Tax Reimbursement Agreement does not violate that mandate.

73. Page 600.16 of the FHLB's Regulatory Handbook attached to the memorandum notes that:

In addition to analyzing tax payments to ensure compliance with regard to timing and amount, regulators should interview management to determine if a written

tax sharing agreement has been established. It is highly desirable for a holding company and its insured subsidiary to have a written tax sharing agreement. Such agreement should contain provisions relevant to the items of regulatory interest noted above (i.e., timing, amount, refunds, and treatment of deferred taxes). All thrift holding companies should be encouraged to develop a tax sharing agreement, and a copy should be obtained for the work paper files.

74. On June 16, 1989, Louis V. Roy, Director of Supervision of the Federal Home Loan Bank Board, Tenth District, Topeka, Kansas, wrote Duane Hall, President of FSA, with inquiries about whether FSA had a tax sharing agreement and included specific questions about how it operated. [PLAINTIFF'S EX. 17] Mr. Roy's letter also stated:

We would like to take this opportunity to point out that a written tax sharing agreement between the thrift and the holding company is highly desirable. We encourage you to adopt such an agreement that addresses all the above matters as soon as practicable, if you have not already done so.

75. On June 27, 1989, Marc C. Woodward, Senior Vice President and Controller of FSA, responded in writing to Mr. Roy's June 16 inquiry. [PLAINTIFF'S EX. 18] Mr. Woodward's response described and attached both the Tax Reimbursement Agreement and the Tax Forgiveness Agreement and responded to Mr. Roy's four specific questions. Mr. Roy's question "4" asked FSA: "In the event that your institution would be eligible for a refund from the taxing authority, how is that refund handled?" [See PLAINTIFF'S EX. 17] In response to that question, Mr. Woodward stated:

As indicated by Exhibit I, cash refunds from the IRS belong to FSC. However, if FSA generates a tax benefit resulting from a net operating loss (based on a computation which excludes FSC), FSA is entitled to reimbursement by FSC, limited to the aggregate amount of cash previously paid to FSC. If the tax benefit exceeds amounts previously paid to FSC, FSA shall be entitled to credits against future amounts to be paid to FSC. [PLAINTIFF'S EX. 18]

76. On July 5, 1989, James Driscoll, Special Projects Coordinator of the FHLB—Tenth District, replied to Marc Woodward's June 27 letter. [PLAINTIFF'S EX. 19] The second and third paragraphs of Mr. Driscoll's letter provided:

We understand that, in the past, a significant amount of taxes has been forgiven by FSC. While it does not appear to be a problem at this time, the agreement specifies that in the event of a recovery, FSA shall be entitled to credits against future amounts to be paid to FSC. It is our position that the proper treatment of tax refunds that become due to the savings institution, is that reimbursement by the parent must be made immediately upon receipt, and not applied as credits against future amounts.

Please confirm that in the event of a tax refund, the amount that would be due to FSA would be paid in a timely basis.

A handwritten note on the bottom of the letter dated July 12, 1989, and initialed by Mr. Woodward states: "Discussed w/ J. Driscoll. Reviewed last paragraph of original letter dated 6/27/89. He now understands situation and requires no further documentation or input." [PLAINTIFF'S EX. 19]

77. In late 1989, the OTS made inquiries of FSA regarding the tax agreements.

a. By letter dated December 1, 1989, Louis V. Roy, Deputy District Director—Supervision, made certain inquiries to Mr. Fleischer regarding the tax agreements. [PLAINTIFF'S EX. 20] Among other questions, Mr. Roy inquired as to how the holding company expected to satisfy the $107 million tax liability then on its books and asked for an explanation as to how the transfer of the liability to the holding company augmented FSA's economic capital.

b. On January 15, 1990, Mr. Fleischer provided a detailed, written response to Mr. Roy. [PLAINTIFF'S EX. 21] Mr. Fleisch-

er's letter addressed all of Mr. Roy's questions.

78. At the time of Mr. Roy's December 1, 1989, correspondence, the OTS was considering requiring FSA and FSC to "reverse" the tax forgiveness entries. Even before Mr. Fleischer's January 15 response, however, an OTS internal memorandum from Bruce Benson to Mr. Roy (and others) dated December 5, 1989, stated in the last paragraph:

> Reversal of the tax forgiveness entries will cause Franklin to fail its capital requirement and establish liability that most likely will never be paid barring a significant change in the income tax code, which I cannot envision anytime soon given the condition of the industry. [PLAINTIFF'S EX. 22]

This position, in effect, adopts the logic of Mr. Fleischer's response.

79. On January 23, 1990, the OTS notified Mr. Fleischer that it had issued a Supervisory Directive on January 9, 1990, requiring the re-establishment of the tax liability that had been forgiven by the holding company, but that, in view of the information submitted by FSA, "the provisions of the directive should be held in abeyance."

80. As of January 31, 1990, FSA capital, according to generally accepted accounting principles, was $388,519,213. [DEFENDANT'S EX. N, No. 249]

81. On February 15, 1990, by order of the OTS, the RTC was appointed conservator of FSA. [PLAINTIFF'S EX. 24]

82. The tax agreements between FSA and FSC could have been, but never have been, repudiated by the RTC, even though the RTC had actual knowledge of them.

83. On February 20, 1990, the OTS directed John Carr of the RTC to make certain "accounting entries" to FSA's books (the "First Wave" of adjustments) the net effect of which was to reduce FSA's capital by over $200 million. This directive *did not* include a requirement that the tax forgiveness entries be reversed. [PLAINTIFF'S EX. 25]

84. The RTC subsequently notified the FDIC that, even after the First Wave of adjustments, FSA was still in capital compliance; the FDIC notified the OTS of that fact. [PLAINTIFF'S EX. 26]

85. As a result, the OTS dispatched Tom O'Rourk to FSA to review its books on March 7, 1990. Following that review, the OTS issued its March 9, 1990, directive requiring the RTC to make additional accounting adjustments to FSA's books (the "Second Wave"), the effect of which was to remove FSA from capital compliance. [PLAINTIFF'S EX. 27]

86. On March 7, 1990, Mr. Roy of the OTS directed an Interoffice Memorandum to the OTS in Washington, D.C., looking for written support for the reversal of the tax forgiveness entries since the FSA situation involved "a somewhat different factual situation which is not fully addressed by the OGC opinion." [PLAINTIFF'S EX. 28] Still not having a written response, on March 27 Mr. Roy once again requested an answer from Washington "soon" since they are required to go to court that week. [PLAINTIFF'S EX. 29]

87. On March 15, 1990, the RTC stated in its Form 8–K filed with the OTS that: "The ROE [Report of Examination conducted between October 16, 1989, and January 8, 1990, by the OTS, the regulatory successor to the FHLB] states that the Registrant's [FSA's] recording of additional paid-in capital as a result of the forgiveness of debt by FSC is in accordance with generally accepted accounting principles." [PLAINTIFF'S EX. 29A, page 6] GAAP is the proper standard for determining capital.

88. On March 27, 1990, Bruce Benson provided a response to Brian McCormally, OTS counsel in Topeka, in the form of an "Interoffice Memorandum." [PLAINTIFF'S EX. 30] Mr. Benson's memorandum cites a section from the holding company handbook stating that "where deferred taxes have been transferred to the holding company" they must be repaid. (It should be kept in mind that this did not occur in the FSA/FSC situation as the "de-

ferred taxes" were not paid to the parent.) The memorandum then goes on to state:

I think we can use this section, with appropriate confirmation from Washington, to support our directives to re-establish these liabilities. If we can obtain Washington's agreement with our interpretation of this paragraph of the holding company handbook, we will have a 'written policy' to quote and Washington can "save face" re enforcing an unwritten policy.

The only argument against this approach would be that the liability was 'forgiven' and that the institutions did not transfer assets to the holding company. I think we can use 'substance over form' logic to defeat this argument. OP is extremely vulnerable to this argument because they admitted today that the first two of their three transfers actually involved cash transactions. [It should be noted that this sentence relates to Overland Park Savings & Loan (referred to in the memorandum as "OP") and not FSA. On March 12, 1986, Richard Fischman gave written approval to Overland Park Savings & Loan to increase capital from holding company tax forgiveness. (Last page of PLAINTIFF'S EX. 21)]

Based on our meeting today with OP, I believe we need more support of our position than 'the transfer presents safety and soundness problems' and 'it is our policy not to allow such transfers', particularly when you consider that we have no written policies re this subject (other than noted above) and that we took no objection to the transfers in the past four years.

89. On May 4, 1990, the RTC wrote FSC asking certain questions about the tax forgiveness and how FSC would ultimately be in a position to pay the taxes when they became due. [PLAINTIFF'S EX. 31] On May 7, 1990, FSC responded to the RTC inquiry reconfirming its commitment and ability to pay the taxes. [PLAINTIFF'S EX. 32]

90. Prior litigation between the parties captioned *Franklin Savings Corporation vs. Office of Thrift Supervision, et al.,* Case No. 90–4054–S in the United States District Court for the District of Kansas, is known as the "OTS Litigation." One of the issues of fact in that litigation challenging the OTS's action of placing FSA in conservatorship was "whether FSA's accounting for tax agreements entered into between FSA and FSC was in accordance with GAAP." [PLAINTIFF'S EX. 32A, Pretrial Order, OTS Litigation, Case No. 90–4054–S, page 127, issue j.]

91. Under the Tax Reimbursement Agreement ("TRA") [PLAINTIFF'S EX. 10]:

a. FSA was obligated to compute its tax liability based on generally accepted accounting principles ("GAAP"). [Paragraph 1]

b. FSA was obligated to pay FSC the amount computed as its separate tax liability under GAAP at such time as it would otherwise pay amounts owed to the Internal Revenue Service. [Paragraph 2]

c. The amount payable by FSA to FSC was limited to (a) the amount of taxes actually payable by the Consolidated Group, *plus* (b) the income tax benefit derived from any losses of FSC included in such Consolidated Return.

d. If FSA's tax computation reflected a net operating loss or excess credits, FSA was required to compute the provision for recovery of current *and deferred* income taxes. FSA was then "entitled to":

(i) to the extent of amounts previously paid to FSC, "reimbursement" by FSC, at such time as FSA would otherwise pay amounts owed to the IRS; or

(ii) if "such recovery" exceeds amounts previously paid to FSC, to "credits" against future amounts to be paid by FSA to FSC under Paragraph 2 of the TRA.

92. The TRA provides that it is to continue in effect until terminated by written agreement between the parties. No such agreement has been executed. It also provides that it is binding on and inures to the benefit of any successor to any of the parties. The TRA has been in full force

and effect from June 30, 1988, through the present time.

93. Under paragraph 2 of the Tax Forgiveness Agreement, "In the event of losses and/or excess credits of Franklin resulting in a benefit described in the Revised Tax Reimbursement Agreement, such amounts shall reduce any liability owed by Franklin to Parent."

94. FSC and FSA elected and consented to file and did file Consolidated Returns for the years ended June 30, 1988, June 30, 1989, and June 30, 1990 (and for other prior years). [PLAINTIFF'S EX. 33A, 33B, & 33C] Each year, FSA computed its tax liability under GAAP as required by the TRA. However, rather than paying any amount over to FSC as required by the TRA, FSA made payments to the IRS of the amount which FSA believed to be its federal tax liability. The difference between GAAP accounting and tax accounting *was not* paid over to FSC.

95. FSC has incurred losses resulting in a tax benefit to the Consolidated Group in the approximate amount of $600,000; under paragraph 2(b) of the TRA the amount of such tax benefit is required to be paid to FSC, but FSA has not done so.

96. Pursuant to the Tax Forgiveness Agreement, FSC forgave approximately $110 million in tax liabilities that FSA would otherwise have owed to FSC. [PLAINTIFF'S EX. 34] As a result of that tax forgiveness, FSC became the primary entity liable for those taxes, and FSA's capital was increased by the amount of the taxes forgiven.

97. FSC amended its Consolidated Returns as follows:

a. On May 8, 1990, FSC filed an amendment to its 1988 Consolidated Return seeking a refund of $151,399.00 which it subsequently amended on September 27, 1990, seeking a revised refund of $87,966.00. [PLAINTIFF'S EX. 35] Neither refund has been received, but was taken into account by the IRS in determining the refund paid to FSC for its year ended June 30, 1988.

b. On March 15, 1991, FSC filed its Consolidated Return for its fiscal year ended June 30, 1990, seeking a refund to FSC of approximately $1,952,145.00 [PLAINTIFF'S EX. 36]

c. On April 22, 1991, FSC filed an amendment to its 1988 Consolidated Return resulting in an additional tax liability of $775,553.00 plus interest thereon in the amount of $262,405.00, both of which were due to the IRS from an FSA subsidiary for that year. [PLAINTIFF'S EX. 37]

d. On April 22, 1991, FSC filed a claim for refund on its 1988 Consolidated Return as a result of the carryback of net operating losses by the Consolidated Group for the year ended June 30, 1990. [PLAINTIFF'S EX. 38]

98. On April 12, 1991, FSC received a refund check from the IRS for its year ended June 30, 1990, in the sum of $1,952,-145.00 (the "First Tax Refund"), [PLAINTIFF'S EX. 39] and on May 15, 1991, received a refund check from the IRS for its year ended June 30, 1988, in the sum of $8,274,949.00 (the "Second Tax Refund") [PLAINTIFF'S EX. 40] (collectively the "Tax Refunds").

99. A portion of the Tax Refunds represents income taxes which FSA previously paid directly to the IRS under the TRA, and a portion of the Tax Refunds represents interest on those taxes.

100. The payments which are represented by the First Tax Refund were made directly to the IRS by FSA. The payments were made under the tax agreements. FSA made the payments directly to the IRS as a matter of administrative convenience.

101. The Second Tax Refund results from the carryback of net operating losses ("NOLS") which were reported by the Consolidated Group for the fiscal year ended June 30, 1990, to obtain a refund of taxes paid by the Group for fiscal year ended June 30, 1988.

102. The Second Tax Refund represents taxes paid in 1988 directly to the IRS by FSA, and interest on those taxes, reduced by a deficiency resulting from the amendment of the Consolidated Return for FYE June 30, 1988. The deficiency represents

additional taxes of $775,553.00 plus interest thereon in the amount of $262,405.00 (the "1988 Deficiency"), both of which were due from an FSA subsidiary.

103. The pertinent federal income tax returns were prepared by Frank Friedman, a partner with Deloitte & Touche.

104. The Tax Refunds were made payable solely to FSC, and FSC negotiated the refund checks by its sole endorsement. The proceeds of the refund checks payable to FSC were deposited by FSC in its bank account.

105. FSA reported an "Income Tax Receivable From Parent" in the amount of $9.1 million in the FSA Form 10–K filed with the OTS for the year ended June 30, 1990. [PLAINTIFF'S EX. 41, page 88] In a note to the financial statements, FSA stated that the $9.1 million represents "amounts due from FSC under the terms of a Tax Reimbursement Agreement between FSC and [FSA]" and that the "timing and ultimate collectibility of the receivable from parent may be affected by the outcome of the [OTS Litigation]." [PLAINTIFF'S EX. 41, page 109]

106. Subsequent quarterly filings with the OTS by FSA on Forms 10–Q reflect similar entries which remain at $9.1 million, without accumulated interest.

107. On September 27, 1991, FSA filed its OTS Form 10–K as of June 30, 1991, increasing the receivable to $10,315,000.00, and that amount has been carried forward into subsequent filings without accumulated interest. [PLAINTIFF'S EX. 42, page F–3]

108. On April 17, 1991, FSC notified FSA that the First Tax Refund had been received by FSC. [PLAINTIFF'S EX. 43]

109. On April 30, 1991, the RTC, as conservator of FSA, wrote to FSC claiming entitlement to the entire refund and demanding delivery of "an amount equal to" the tax refund. [PLAINTIFF'S EX. 44]

110. On May 14, 1991, FSC brought an action in the United States District Court for the District of Kansas captioned *Franklin Savings Corporation .v. Resolu-*

*tion Trust Corporation, as Conservator for Franklin Savings Association,* Case No. 91–4079–R (the "Tax Refund Litigation"). [PLAINTIFF'S EX. 45] Because the Second Tax Refund was received immediately after filing the original complaint, a First Amended Complaint was filed on May 17, 1991.

111. The First Amended Complaint seeks a declaratory judgment that FSC is entitled to the Tax Refunds: (a) under the TRA as a credit against (i) a deferred tax liability which it is alleged was reestablished by the RTC/FSA, (ii) attorneys' fees and expenses of the OTS Litigation by reason of federal statute, and (iii) because the FSA Board of Directors authorized that those expenses be incurred on its behalf; and (b) as a set-off against amounts owed to FSC by FSA for any liability, including liability under the TRA for attorney's fees and expenses. [PLAINTIFF'S EX. 46]

112. The First Amended Complaint also seeks a declaratory judgment that FSC is entitled to the 1988 Deficiency. [PLAINTIFF'S EX. 46]

113. Subsequent to the initiation of the Tax Refund Litigation, FSC filed its Petition in this Court seeking relief under Chapter 11.

114. The RTC/FSA sought, by various motions in the Bankruptcy Court, to have the Tax Refund Litigation determined in the United States District Court rather than in the Bankruptcy Court. The Bankruptcy Court denied those motions. Subsequently, FSA, by the RTC as its Conservator, filed a proof of claim in this proceeding (a) claiming ownership of the Tax Refunds as well as the earnings thereon; or, in the alternative, (b) an unsecured claim for the sum of $10,472,547.00 plus interest. [RTC Proof of Claim]

115. FSC objected to the FSA proof of claim and filed its counterclaim against FSA as an adversary proceeding under Fed.R.Bankr.P. 3007 and 7001 to recover money or property from the counterclaim defendant.

## CONCLUSIONS OF LAW

■ The income tax filing regulations covering consolidated returns for affiliated corporate groups, Treasury Regulation § 1.1502-77(a), confer no substantive right upon FSC to retain the tax refund proceeds. When a subsidiary pays the original tax and incurs net operating losses that generate a refund, the subsidiary is entitled to any such tax refund. The parent is not entitled to keep the refund, or to offset it against amounts due from the subsidiary. The parent simply acts as a trustee or an agent, and it should pay the funds over to the subsidiary. *E.g., In re Bob Richards Chrysler–Plymouth Corp., Inc.,* 473 F.2d 262, 265 (9th Cir.1973), *cert. denied sub nom.,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); *Jump v. Manchester Life & Casualty Management Corp.,* 438 F.Supp. 185, 189 (E.D.Mo.1977), *aff'd,* 579 F.2d 449 (8th Cir.1978).

But, where there is an agreement between the parent and the subsidiary about the refunds, an exception to the holdings of *Richards* and *Jump* may dictate a different result. As *Richards* itself states:

> Normally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability.

*Richards,* 473 F.2d at 264.

■ In this case, there are agreements between the parent and subsidiary about tax liabilities, and FSC claims that an analysis of the plain language of the agreements, the intent of the parties, and the actions taken under the agreements reveal that the parties intended the refunds to be the property of FSC.

The Tax Reimbursement Agreement ("TRA") provides for "reimbursement" and "credits" to FSA. These terms are inconsistent with the argument that FSA "owns" the refunds. "Reimburse" means "[t]o pay back." Black's Law Dictionary at 1157 (5th ed. 1979). The use of this term is consistent with a "debt" or "receivable," rather than with ownership. If the parties considered the refund to be property of FSA, they could have provided for its "return" to FSA. The parties' selection of terms indicates that they intended the obligation to be in the nature of a receivable. So goes FSC's argument on the meaning of the agreements. In short, under the terms of the agreements, FSA holds only an unsecured claim, not ownership of the refunds. The Court agrees with this construction of the language of the tax agreements. However, according to FSA, there is more to the problem than the meaning of the terms of the agreements.

■ Kansas law imposes a fiduciary duty of fairness on a controlling individual shareholder concerning his dealing with the interests of minority shareholders of a closely held corporation. *Newton v. Hornblower, Inc.,* 224 Kan. 506, 518, 582 P.2d 1136, 1143 (1978); *Oberhelman v. Barnes Inv. Corp.,* 236 Kan. 335, 343, 690 P.2d 1343, 1350 (1984). Delaware corporate law, which is the pattern for that of Kansas,[2] imposes the same rule of fair dealing in parent-subsidiary relationships. *Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883 (Del. Supr.1970).[3] Although the Kansas court has apparently not had occasion to speak on the subject in the context of a parent-subsidiary situation,[4] there is no reason to believe that it would announce a different rule in that circumstance.[5]

2. *Vogel v. Missouri Valley Steel, Inc.,* 229 Kan. 492, 625 P.2d 1123 (1981). (Delaware decisions interpreting its corporate code are considered persuasive in our interpretation of the Kansas corporate code.)

3. This case gives an excellent explanation of the standards used in applying the corporate fairness doctrine.

4. Neither party has cited Kansas cases, nor has the Court discovered any, that announce the

corporate fairness rule in the parent-subsidiary context.

5. In *Getty Oil Co. v. Skelly Oil Co.,* 267 A.2d 883 (Del.Supr.1970), the court cited *Meyerson v. El Paso Natural Gas Co.,* 246 A.2d 789 (Del.Ch.Ct. 1967), and quoted this passage showing that the fairness test applies in the parent-subsidiary context as well: "... [T]he nature and extent of fiduciary duty depend upon the circumstances and the relationship of the parties in each case. Where the problem concerns (the) duty of ma-

■ Where the corporate parties have agreed in, writing to allocate tax liabilities under consolidated return procedures, and the agreement results in advantage to one member over another, the agreement will control unless it can be shown that the advantaged member has acted "unfairly" in the fiduciary relationship. The concept of "unfairness" equates to "gross and palpable overreaching" as the following Am. Jur.2d review of cases on the subject reveals: [6]

§ 802. **Tax matters** An agreement between parent corporation and its subsidiary for the allocation of tax savings from a consolidated tax return is not subject to judicial interference on complaint of minority interests, even though an advantage is obtained by the dominant group, because there is no loss or disadvantage to the subsidiary. Nor is it *unfair* for a loss-parent corporation to appropriate to itself all, or nearly all, tax savings resulting from the filing of consolidated tax returns with its profit-making subsidiary. The same is true in the case of a profit-parent and loss-subsidiary, and the utilization by a parent of its subsidiary's tax loss carryover is not illegal in the absence of *gross and palpable overreaching*. Likewise, the retention of tax savings by a profit-subsidiary resulting from the filing of consolidated tax returns is not *unfair* as to the loss-parent. Furthermore, where a parent corporation obtains an income tax refund on account of consolidated net operating losses arising from carrying back the loss incurred after sale of a subsidiary, the parent is under no fiduciary responsibility to account to the subsidiary for the

tax refund.... (Emphasis added, citations omitted.)

18A Am.Jur.2d § 802.

■ FSA argues that FSC has breached its fiduciary duty to it by unfairness and overreaching through the creation and implementation of the tax agreements. Consequently, FSA contends, the Court should award it the tax refunds through the remedy of a state law constructive trust.

■ Under Kansas law, a constructive trust is an equitable remedy used where a fiduciary unjustly benefits from its relationship. *Grubb v. Grubb*, 208 Kan. 484, 490, 493 P.2d 189, 195 (1972); *Andres v. Claassen*, 238 Kan. 732, 741–42, 714 P.2d 963, 970 (1986). The trust is a creature of law imposed when fraud or · other unconscionable conduct improperly confers advantage within a fiduciary relationship: [7]

A constructive trust is one which arises, not by virtue of any agreement, but by operation of law where a person who occupies a fiduciary relationship toward another unjustly gains therefrom some benefit or advantage accruing to himself by means of *fraud or other unconscionable conduct.* (Emphasis added.)

*Grubb v. Grubb*, 208 Kan. 484, 490, 493 P.2d 189, 195 (1972).

Although FSA fails to say so expressly in its brief, it apparently believes that since the fairness and overreaching test of corporate law and the unconscionability test of constructive trust law are the same—both disparage a fiduciary gaining advantage by some kind of bad conduct—the question for decision is whether FSC's conduct in relation to the creation and implementation of

---

jority stockholders to the minority, or, more specifically, as here, parent corporation to minority shareholders of its subsidiary the 'basic question is almost always one of fact: Were the minority stockholders fairly treated?' ... The test to be applied therefor (sic), is that of fairness." *See also Corporate Fiduciary Doctrine in the Context of Parent–Subsidiary Relations*, 74 Yale L.J. 338 (1964) for an early suggested standard for determining fairness.

**6.** The quoted material cites the following cases: *Case v. New York C.R. Co.*, 15 N.Y.2d 150, 204 N.E.2d 643, 256 N.Y.S.2d 607 (N.Y.App.1965);

*Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789 (Del.Ch.1967); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72 (Del.Supr.1969); *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883 (Del. Supr.1970).

**7.** Advantage to the fiduciary implies a disadvantage to the other party. See Laycock, *The Scope and Significance of Restitution*, 67 Tex.L.Rev. 1277 (1989), and Davis, *Equitable Liens and Constructive Trusts in Bankruptcy: Judicial Values and the Limits of Bankruptcy Distribution Policy*, 41 Fla.L.Rev. 1 (1989), for where the constructive trust fits in the larger picture.

the tax agreements can be said to satisfy either test, i.e., did FSC act unfairly or unconscionably toward FSA? If so, a constructive trust could be imposed. According to FSA, the 10th Circuit law permits the imposition of a constructive trust in the context of a dispute over whether debtor's property comes into the bankruptcy estate. *In re Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir.1987).

Since 11 U.S.C. § 541(a) says that the bankruptcy estate is comprised of all legal or equitable interests *of the debtor* in property as of the commencement of the case, if such a trust is imposed, FSC will be deemed to hold only bare legal title to the refunds. Accordingly, the equitable ownership interest in the refunds will belong to FSA and will not pass into the bankruptcy estate.

This Court does not agree that *Mahan* is necessarily the final authority on the purely legal question of whether, where a state court has not imposed a constructive trust pre-bankruptcy, a federal bankruptcy court should use state constructive trust law to prevent property from coming into the bankruptcy estate.[8] The *Mahan* decision does not show that the Court of Appeals was being asked to decide this purely legal question—one that may well involve serious federal interests under the Bankruptcy Code.[9] However, in this case the only question that needs resolution, and the only one that will be addressed by this Court, is the factual one of whether FSC has acted unfairly under corporate law or unconscionably under equity so as to entitle FSA to an equitable ownership of the tax refunds.

FSA likens the effect of the tax agreements in this case to those in *Lincoln Sav. & Loan Ass'n v. Wall*, 743 F.Supp. 901 (D.D.C.1990). The tax agreements in *Lincoln* were used to transfer funds to its parent for improper purposes and contrary to law. The parent ACC was strapped for funds to meet debt service on a $51 million obligation and had stored up net operating loss carry forwards that it could use against Lincoln's earnings. In order to upstream funds from the subsidiary to the holding company, tax agreements were made that required Lincoln to remit to ACC on a quarterly basis the tax it would owe based on its "net profits" calculated under GAAP. As the tax agreements were interpreted and applied by ACC, Lincoln was required to forward all of its GAAP profits to ACC even though it owed no taxes on a stand-alone basis. The court found that since Lincoln owed no taxes, it was in effect making unsecured loans to ACC when it remitted payments under the agreements. Such unsecured loans from a savings and loan to its holding company parent were contrary to regulations. In 1984–1987, Lincoln paid $94 million to ACC against which ACC was able to use its losses to avoid taxes and retain the funds in full. The court found that FHLB had approved the agreements only as agreements to share based on actual tax liability. Yet, the agreements were actually used to transfer $94 million to ACC when Lincoln had no tax liability on a stand-alone bases. Moreover, the tax agreements in Lincoln were used to pass fictitious profits of con-

---

**8.** *In re Cascade Oil Co., Inc.*, 65 B.R. 35 (Bankr. D.Kan.1986):

> The difficulty with a constructive trust theory is, of course, that the "trust" is neither a trust nor constructive, but is a device created by the courts to prevent injustice. *In re First Capital Mortgage Loan Corporation*, 60 B.R. 915 (1986); *In re North American Coin & Currency, Ltd.*, 767 F.2d 1573 (9th Cir.1985). It has the effect in bankruptcy, if applied, of preferring one creditor over another on the basis of equitable principles. The same equitable principles, however, dictate that in bankruptcy all unsecured creditors be treated essentially alike.

**9.** *Mahan* holds that the bankruptcy court was correct in imposing a constructive trust that prevented property from coming into the bankruptcy estate. However, nothing in the opinion indicates that the court was asked to, or intended to, consider the larger issue of whether federal interests militate against the bankruptcy court imposing such a state law trust, which is in reality a remedy, not a trust, when the effect is to deprive the estate of property that would otherwise be distributed according to Code priorities in liquidation or reorganization. See, for one aspect of the problem, Cuevas, *Bankruptcy Code Section 544(a) and Constructive Trusts: The Trustee's Strong Arm Powers Should Prevail*, 21 Seton Hall L.Rev. 678 (1991).

trived transactions from Lincoln to ACC in order to fund the parent's needs for its own obligations. In the case at bar, however, the evidence is dramatically different.

FSA had issued $2.9 million of Zero Coupon Bonds in November of 1984. The bonds were collateralized by mortgage-backed securities. Under the terms of the bond obligation, if FSA became deficient in its regulatory capital, it would trigger a default of the bonds. If this were to occur, FSA would have been obligated to substitute U.S. Treasury securities for the mortgage-backed securities that collateralized the bonds. This would have resulted in millions of dollars of loss to FSA because of differences in interest rate spread.

Because savings and loan capital requirements were to tighten at the end of 1985, the officers of FSA and FSC wanted to put in place a plan that would cushion FSA against having a deficiency in capital that would cause default on the bonds. At the time the plan was conceived, FSA was in capital compliance and continued to be so after the implementation of the tax forgiveness agreements.

The tax reimbursement and forgiveness agreements were designed to allow FSC to assume FSA's tax liability, then forgive the debt if it became necessary to avoid a capital deficiency. If the tax debt was forgiven by FSC, the result would be an increase in FSA's capital, thus providing a cushion against the added risk of a capital deficiency brought about by the forthcoming regulatory change.

The agreements required FSA to pay FSC only its stand-alone tax liability, not all of its profits as was the case in *Lincoln*. For administrative convenience, FSA paid its assumed tax liability directly to the IRS on several occasions, rather than to FSC.

The agreements were discussed with Dick Fischman, Vice President of FHLB, in the fall of 1985. He requested that Deloitte Haskins & Sells opine on whether the agreements' intended result to increase FSA's capital would meet the requirements of GAAP. FSA's accountants approved the tax agreements as a proper way to increase the capital of FSA under GAAP principles. The existence of the tax agreements and their operational features were reported to FSLIC on June 30, 1987, June 30, 1988, and June 30, 1990. FSA/RTC has never repudiated the agreements, and they have been in full force and effect from June 30, 1985. By their terms, the agreements continue in effect until terminated by written agreement between the parties. The agreements bind and inure to the benefit of any successor to any of the parties.

FHLB's Regulatory Handbook stated, "It is highly desirable for a holding company and its insured subsidiary to have a written tax sharing agreement." The evidence shows correspondence of June 16, 1989, from Louis V. Roy, Director of Supervision of the FHLB, which stated, "We encourage you to adopt such an agreement that addresses all the above matters as soon as practicable, if you have not already done so."

During the three-year period ending June 30, 1988, FSC forgave income tax receivables from FSA of over $100 million under the agreements. FSC became the primary entity liable for those taxes that would otherwise have been owed by FSA, and FSA's capital was increased accordingly. This was an economic advantage to FSA and its shareholders. FSC did not cause FSA to use the capital garnered from the forgiveness plan to support growth or pay dividends to shareholders.

FSA complains that one of the forgiveness transactions routed funds from the subsidiary to the parent. In this transaction, FSA issued stock to FSC which the subsidiary later repurchased. Although the transaction may have been an advantage to the parent, the evidence indicates that it also benefitted the minority shareholders of FSA and there is no evidence that the transaction was in anyway improper or contrary to corporate authority.

FSC has acted as agent of the consolidated group and has collected the refunds as it is entitled to do under the tax law and under the agreements. Nothing in the evidence shows that the reasonable expectations of the parties as to how the agree-

ments would operate has been altered since the agreements were executed.

The question whether FSC has acted "unfairly," "overreachingly," or "unconscionably" in the creation or implementation of the tax agreements or in its other dealings with FSA is one of fact. While there is no doubt that FSC owes a fiduciary duty to FSA, there is no evidence that such duty has been breached by any self-dealing or unconscionable conduct of its controlling parent. To the contrary, everything that has been done has been advantageous to FSA. Accordingly, there is no basis in fact for imposing a constructive trust on the tax refunds and the Court finds that FSA has no equitable rights in the tax refunds.

FSC has urged the Court to accept the factual findings Judge Saffels made in *Franklin Sav. v. Office of Thrift Supervision,* 742 F.Supp. 1089 (D.Kan.1990), as legally binding factual findings in this case. This Court finds it unnecessary to address that request since it has made its own independent findings of fact based on the evidence presented on the record made here.

### CONCLUSION

The Court finds that the evidence does not support the imposition of a state law constructive trust, whether premised on a corporate doctrine of fairness or an equitable remedy for unconscionable conduct by a fiduciary. Under the Court's interpretation of the agreements, FSC is the owner of the tax refunds, subject to its continuing duties as spelled out therein and under the consolidated filing procedures of the tax laws. The tax refunds are therefore ruled to be property of the bankruptcy estate by operation of 11 U.S.C. § 541. Decision on the remaining objections to FSA's unsecured claim is deferred to a later date.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed. R.Civ.P. 52(a).