In re FIRST CENTRAL FINANCIAL CORPORATION, Debtor.

Superintendent of Insurance for the State of New York, as Liquidator of First Central Insurance Company, Plaintiff,

v.

First Central Financial Corporation, and Martin Ochs, Esquire, as Chapter 7 Trustee of First Central Financial Corporation, Defendants.

Bankruptcy No. 98–12848–608.
Adversary No. 99–1254–608.

United States Bankruptcy Court, E.D. New York.

Nov. 6, 2001.

William O. Purcell, Kirkpatrick & Lockhart, LLP, New York City, for the Superintendent of Insurance for the State of New York.

Martin P. Ochs, Ochs & Goldberg, LLP, New York City, Chapter 7 Trustee.

Norman N. Kinel, Sidley Austin Brown & Wood, LLP, New York City, for Martin P. Ochs, Chapter 7 Trustee.

## MEMORANDUM DECISION

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the Court on the motion of the Superintendent of Insurance for the State of New York (the "Superintendent" or "plaintiff"), in his capacity as Liquidator of First Central Insurance Company ("FCIC"), for summary judgment declaring that a certain federal income tax refund paid to, and held by the Chapter 7 Trustee of First Central Financial Corporation ("FCFC" or "debtor"), is property of FCIC. The trustee has cross-moved for summary judgment dismissing the complaint. Summary judgment is granted to the trustee for the reasons set forth below.

### Jurisdiction

The jurisdiction of the bankruptcy court is set forth in 28 U.S.C. §§ 1334(b) and 157(b)(1) which provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a

case under title 11 ... and may enter appropriate orders and judgments, subject to review [by the district court in an appeal]." *U.S. Lines, Inc. v. American Steamship Owners Mut. Prot. and Indem. Assoc., Inc. (In re U.S. Lines)*, 197 F.3d 631, 636 (2d Cir.1999). A bankruptcy judge may also hear non-core proceedings that are related to a case under title 11. In such proceedings, the bankruptcy judge shall not determine the issue, but shall submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c).

 In the first instance, the determination whether a claim is "core" is "reserved for the bankruptcy judge to determine." *Corbett v. MacDonald Moving Serv., Inc.*, 124 F.3d 82, 90 (2d Cir.1997). Whether a matter is "core" depends on the nature of the proceeding. *Resolution Trust Corp. v. Best Prod. Co., Inc. (In re Best Prod. Co., Inc.)*, 68 F.3d 26, 31 (2d Cir.1995). The dispute here involves a determination of whether a certain federal income tax refund received by the trustee post-petition belonged to the debtor or to its subsidiary. If the tax refund belongs to the debtor, the trustee must transfer the funds held in escrow into FCFC's bankruptcy estate. Thus, this proceeding is akin to a turnover proceeding and is concerned with the administration of the estate. Accordingly, this Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (E), (O) and the Eastern District of New York standing order of reference dated August 28, 1986.[1] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law to the extent required by Fed.R.Bankr.P. 7052.

*Facts*

The relevant facts set forth below are not in dispute except as otherwise indicated. The debtor, FCFC, is a holding company that owns all of the shares of FCIC, a New York regulated insurance company. (Doc. 22 ¶ 1.)[2] On January 28, 1998, the New York Supreme Court, Nassau County entered an order pursuant to N.Y.Ins.Law § 7402 (McKinney 2000) directing the Superintendent to rehabilitate FCIC. (Doc. 13 ¶ 2; Doc. 20 at 3–4.) Thereafter, by petition dated March 20, 1998, the Superintendent sought the entry of an order for the liquidation of FCIC, which order was entered on April 27, 1998. (Doc. 13 ¶ 2; Doc. 20 at 4.) On March 5, 1998, FCFC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York. (Doc. 20 at 4.) By order dated April 30, 1998, FCFC's Chapter 11 case was converted to Chapter 7, and by order dated May 7, 1998, Martin P. Ochs was appointed the Chapter 7 Trustee of FCFC's estate (the "Trustee" or "defendant"). (Doc. 20 at 4.)

---

**1.** Although the Superintendent stated in his complaint that he "does not necessarily believe" that this proceeding is core, he did not state whether he does or does not consent to the entry of final orders or judgments by this Court. Fed.R.Bankr.P. 7008(a); (Doc. 1 ¶ 5.) However, on this motion, the status of this proceeding as core or non-core has little practical significance, because, in core as well as non-core proceedings, a bankruptcy court's determination of a motion for summary judgment is subject to de novo review. 28 U.S.C. § 157(c)(1); *Cazenovia College v. Renshaw (In re Renshaw)*, 222 F.3d 82, 86 (2d Cir.2000); *Silver State Dev. & Mgmt. Corp. v. Bank of America (In re Silver State Dev. & Mgmt. Corp.)*, 121 F.3d 717, at *1 (9th Cir. August 4, 1997) (Unpublished disposition) ("A grant of summary judgment by a bankruptcy judge is reviewed de novo by the district court whether it is a "core" or "non-core" proceeding.")

**2.** Citations to "Doc." refer to documents listed on the Bankruptcy Court docket, identified by docket number.

At issue in this adversary proceeding is whether a certain tax refund of approximately $2.5 million ("Tax Refund"), received by the debtor after the commencement of this case from the Internal Revenue Service ("I.R.S."), and currently held by the Trustee in a segregated interest bearing account, is property of the bankruptcy estate of FCFC. FCFC filed consolidated tax returns on behalf of itself and its wholly-owned subsidiaries, FCIC and Mercury Adjustment Bureau[3] (collectively, the "Group"). All refund checks received in respect of the Group's consolidated tax filings were made payable to FCFC. (Doc. 20 at 5.) FCFC and FCIC executed a tax allocation agreement, undated on its face, entitled "Agreement of Tax Allocation Between First Central Financial Corp. and First Central Insurance Company" (the "Tax Allocation Agreement").

### The Group's Tax History

In 1993, the Group paid a total of $2,480,458 in federal income taxes, which consisted of a 1992 federal income tax overpayment of $20,458, and FCIC's aggregate payment of $2,460,000. (Doc. 22 ¶ 5.) The Group's total tax liability for 1993 was $1,857,080, resulting in a tax overpayment of $623,378. (Doc. 22 ¶¶ 5, 6.) In 1994, the Group paid a total of $3,550,000 in federal income taxes, which consisted of the 1993 tax overpayment and FCIC's aggregate payment of $2,926,622. (Doc. 22 ¶ 6.) The Group's total tax liability for 1994 was $2,729,750, resulting in a tax overpayment of $820,250. (Doc. 22 ¶¶ 6, 7.) In 1995, the Group paid a total of $2,894,250 in federal income taxes, which consisted of the 1994 tax overpayment, and FCIC's payment of $2,074,000. (Doc. 22

¶ 7.) The Group's total tax liability for 1995 was $807,247, resulting in a tax overpayment of $2,087,003. (Doc. 22 ¶ 7.) The Group filed an application for a refund of $1,700,000 for its 1995 tax overpayment, which it received in 1996, and which FCFC paid to FCIC. (Doc. 22 ¶ 8.) The balance of the 1995 tax overpayment was applied toward the Group's 1996 tax payment of $1,362,003, of which FCIC paid an aggregate of $975,000. (Doc. 22 ¶ 9.) The Group had no tax liability for 1996 or 1997, and made no federal income tax payments in 1997. (Doc. 22 ¶ 9, 10.)

In 1996 and 1997, the Group reported consolidated losses of $7,803,374 and $28,723,242, respectively, to the I.R.S. (Doc. 22 ¶¶ 11, 13.)

In 1993, 1994 and 1995, on a stand-alone basis, FCFC had losses aggregating at least $3,391,777. (Doc. 27 ¶ 12.) For those years, FCIC had no losses, but had taxable income. In 1996, on a stand-alone basis, FCIC had $7,419,101 in losses, and FCFC had $827,911 in losses. (Doc. 22 ¶ 12.)

In 1997, on a separate stand-alone basis, FCIC had $28,171,396 in losses, and FCFC had $575,124 in losses. (Doc. 22 ¶ 14.) In 1997, the Group received three checks in the aggregate amount of $3,701,465, representing a refund of taxes paid by the Group in 1993, 1994 and 1996, all of which were endorsed over by FCFC to FCIC. (Doc. 22 ¶¶ 16, 18.)

In December 1998, based upon the losses incurred by the Group in 1997, the Trustee filed a consolidated refund request on behalf of the Group and sought a refund of the remainder of taxes paid in 1994 and 1995. (Doc. 22 ¶ 19.) In response, the I.R.S. sent the Trustee a check for

---

**3.** Mercury Adjustment Bureau is not a party in this action. Pursuant to an order of this court, the capital stock of Mercury Adjust-

ment was sold by the Trustee to a third party in mid-June 1999. (Doc. 20 at 3 n. 2.)

$2,501,599, the tax refund at issue in this adversary proceeding, made payable to "First Central Financial Corporation c/o Ochs Chptr 7 TTee Ochs and Goldberg" (the "Tax Refund"). (Doc. 22 ¶ 20.)

### The Issues on this Motion

The Trustee contends that the Tax Refund is property of FCFC's estate. Property of the estate "is comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As reflected in the statutory language, Congress intended a broad range of property to be included in property of the estate. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *Official Comm. of Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines Inc.)*, 928 F.2d 565, 569 (2d Cir.1991); *Garner v. Strauss (In re Garner)*, 952 F.2d 232, 233 (8th Cir. 1991) (finding that property held in tenancy by the entirety, where both spouses had jointly incurred the debt, was property of the estate even if only one spouse was in bankruptcy); *Yaquinto v. Greer*, 81 B.R. 870, 878 (N.D.Tex.1988) (finding that check payable to the debtor was included in the estate even if the identity of the party ultimately entitled to the funds was in dispute).

However, § 541(d) of the Bankruptcy Code makes it clear that, where the debtor holds bare legal title to the property (for example, as trustee), only the debtor's legal interest, but not the beneficial interest in the property, becomes property of the estate:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest … becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the

extent of any equitable interest in such property that the debtor does not hold. 11 U.S.C. § 541(d).

■ "It is necessary to examine whether the debtor owns the property absolutely, conditionally, or merely through some lesser relationship, such as a bailment, agency, or consignment, whereby the goods actually belong, save for the debtor's right to possession, completely to another." 5 Collier on Bankruptcy ¶ 541.06[1][a] (15th rev. ed.2001). The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. *Crysen/Montenay Energy Co. v. Esselen Associates, Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1101 (2d Cir.1990); *Prudential Lines*, 928 F.2d at 569.

■ Clearly, the Trustee has a legal interest in the Tax Refund, and the Tax Refund is property of the estate to the extent of that interest. *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 931 (6th Cir.2000) ("[W]ith respect to items debtor obtained with the embezzled funds, while the debtor did not obtain equitable title to these proceeds, he did obtain legal title; all that is necessary to include those assets in the bankruptcy estate"); *Yaquinto*, 81 B.R. at 878 (finding that proceeds of check paid to debtor as a result of a clerical error is property of the estate although debtor might not ultimately have the right to keep the proceeds); *In re John Clay & Co., Inc.*, 43 B.R. 797, 811–12 (Bankr.D.Utah 1984). However, the debtor is not entitled to retain a beneficial interest in the funds if the debtor holds only bare legal title to the Tax Refund as trustee or agent for FCIC. *T & B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir.1989) (finding that property held by the debtor for the benefit of another was not property of the estate). On the other hand, if the beneficial interest in the Tax

Refund is also property of the estate, then FCIC will not be entitled to a turnover of those funds, but will have a claim against the bankruptcy estate of FCFC in the amount of the portion of the Tax Refund that it is entitled to receive from FCFC under the Tax Allocation Agreement.

### Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (on a motion for summary judgment, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion"); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating the non-existence of any genuine issue of material fact, which burden may be discharged by pointing out the absence of evidence supporting the non-moving party's case. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548. Once faced with a properly supported motion, Fed.R.Civ.P. 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the 'depositions, answers to the interrogatories, and admissions on file,'

designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

The non-moving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Id.* at 257, 106 S.Ct. 2505. Therefore, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, or simply raise doubts as to the veracity of the moving party's assertions. *Borgognone v. Trump Plaza,* No. 98–CV–6139 (ILG), 2000 WL 341135, at * 7 (E.D.N.Y. March 9, 2000); *Harper v. United States,* 949 F.Supp. 130, 131–32 (E.D.N.Y.1996).

When no rational trier of fact could find in favor of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact requiring a trial and a grant of summary judgment is proper. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

Here, the material facts are not in dispute, and the Trustee is entitled to summary judgment.

### Discussion

### I. *Applicable Tax Law in the Absence of a Tax Allocation Agreement*

The Tax Refund at issue was generated by operation of a net operating loss carryback under the Internal Revenue Code ("I.R.C."). Net operating loss carryback is a form of income averaging that permits a taxpayer to use current losses to

reduce taxable income in prior years. *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.),* 222 B.R. 417, 423 (Bankr.S.D.N.Y. 1998); 26 U.S.C. § 172; *see Prudential Lines,* 928 F.2d at 567. If a consolidated group has net operating losses ("NOLs") to offset income earned in the previous taxable years, the consolidated group as a whole will be entitled to a refund of taxes paid on those years because corporations that file consolidated returns "are treated as a single entity for income tax purposes as if they were in fact one corporation." *Prudential Lines,* 928 F.2d at 569 (citing *Exxon Corp. v. United States,* 785 F.2d 277, 280 (Fed.Cir.1986)); *see* 26 U.S.C. § 172; *see Federal Deposit Ins. Corp. v. Brandt (In re Florida Park Banks, Inc.),* 110 B.R. 986, 987 (Bankr.M.D.Fla.1990). Here, the Group's losses for 1997 were carried back to reduce the Group's tax liability for 1994 and 1995, resulting in the Tax Refund at issue.

The Superintendent points out that, under applicable I.R.S. regulations, a parent company acts as agent for the consolidated group in filing consolidated tax returns. 26 C.F.R. § 1.1502–77(a). But, as the Superintendent concedes, this agency is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S. *See Jump v. Manchester Life & Cas. Mgmt. Corp.,* 579 F.2d 449, 452 (8th Cir. 1978) (agency relationship provided in Tax Regulations is "for the convenience and protection of the I.R.S. only and does not extend further"); *Prudential Lines,* 928 F.2d at 571 (same).

Moreover, the I.R.C. does not address the issue of which member of a consolidated group is ultimately entitled to receive a consolidated tax refund. *Capital Bancshares, Inc. v. Federal Deposit Ins. Corp.,* 957 F.2d 203, 206 (5th Cir.1992) ("[T]he I.R.C. is silent as to whether a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving"); *Jump,* 579 F.2d at 452 (noting that the entity that is ultimately entitled to receive the benefit of a consolidated tax refund is a matter which is not addressed in the Internal Revenue Code); *Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp., Inc.),* 473 F.2d 262, 264 (9th Cir. 1973) ("The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue").

Some courts have held that, in the absence of a tax allocation agreement, principles of unjust enrichment dictate that when a subsidiary pays the original tax, *and* incurs NOLs that generate a refund, the subsidiary is entitled to the resulting tax refund. *Bob Richards,* 473 F.2d at 265; *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),* 159 B.R. 9, 29 (Bankr.D.Kan.1993); *White Metal Rolling,* 222 B.R. at 424. These courts reasoned that the parent company would be unjustly enriched if it were allowed to keep the tax refund since it paid none of the refunded taxes. *Florida Park Banks,* 110 B.R. at 989. Even if both the subsidiary and the parent company sustained losses that could be used to generate the tax refund, the subsidiary has been held to be entitled to the entire refund if it could have generated the same tax refund without the use of the parent company's losses. *Id.; Capital Bancshares,* 957 F.2d at 207. By the same token, courts have held that the subsidiary is not entitled to share in consolidated refund in an amount greater than the amount paid by the subsidiary for its tax liability, and it is not entitled to compensation from other group members for use of its NOLs to generate a

tax refund. *Jump*, 579 F.2d at 454; *Capital Bancshares*, 957 F.2d at 207–08; *Florida Park Banks*, 110 B.R. at 987.

Whether, in the absence of a tax allocation agreement, FCIC would be entitled to the entire Tax Refund, under the reasoning of the above-cited cases, is an issue that this Court need not decide. Here, the parties' rights and obligations are governed by the Tax Allocation Agreement.

### A. *The Tax Allocation Agreement*

■ As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement. *Capital Bancshares*, 957 F.2d at 207; *Bob Richards*, 473 F.2d at 264. The agreement will control the members' rights in the absence of overreaching or breach of fiduciary duty. *White Metal Rolling*, 222 B.R. at 423; *Franklin*, 159 B.R. at 29. A tax allocation agreement does not alter each member's liability to the government for the entire tax. *Id.* at 424.

■ The Tax Allocation Agreement governs FCFC's and FCIC's obligations, as among themselves, for the payment of federal income taxes, and provides for the allocation of tax refunds received by the Group. (Doc. 22 ¶ 2.) The question presented to this Court is whether, under the Tax Allocation Agreement, FCFC holds the Tax Refund as trustee for FCIC, or otherwise holds only bare legal title to the Tax Refund, such that the beneficial interest in the Tax Refund is not property of the estate. To answer this question, it is necessary to examine the terms of the Tax Allocation Agreement.

The Tax Allocation Agreement, which is attached as Exhibit B to the Superintendent's Complaint in this adversary proceeding, provides in relevant part as follows:

First Central Financial Corp. (the holding company) and First Central Insurance Company (the subsidiary) agree to participate in filing a consolidated Federal Income Tax Return as follows:

A. The tax charge or refund to First Central Insurance Company under this Agreement shall be an amount that First Central Insurance Company would have paid or received if it had filed on a separate return basis with the Internal Revenue Service.

An escrow account shall be established to recoup Federal Income Taxes in the event of future net losses consisting of assets eligible as an investment for First Central Insurance Company by First Central Financial Corp. in an amount equal to the excess of the amount paid by First Central Insurance Company to First Central Financial Corp. over the actual payment made by the parent company to the Internal Revenue Service.

Escrow assets may be released to First Central Financial Corp. from the escrow account at such time as the permissible period for loss carrybacks has elapsed.

B. The tax charge to First Central Insurance Company shall not be more than it would have paid if it had been filed on a separate return basis. First Central Insurance Company shall be paid for any foreign credits, investment credits, losses or any loss carry over generated by it to the extent actually used in the consolidated return. All payments shall be recorded on First Central Insurance Company's books as contributed surplus.

If the amount paid by First Central Insurance Company to First Central Financial Corp. for Federal Income Taxes is greater than actual payment

made by First Central Financial Corp. to the Internal Revenue Service, then the difference shall be placed in escrow in the same manner and under the same conditions as in (A) above. First Central Insurance Company, once having been paid for its credits, cannot use such credits in the calculation of its tax liability under the separate return basis. Any of First Central Insurance Company's credits which are not used in the consolidated return and for which it has not been paid, shall be retained by First Central Financial Corp. for possible future use.

C. All settlements under said Agreement shall be made within thirty (30) days of the filing of the applicable estimated or actual Federal Corporation Income Tax Return with the Internal Revenue Service.

Where a refund is due, First Central Financial Corp. may defer payment to First Central Insurance Company to within thirty (30) days of receipt of such refund. All settlements shall be made in cash or securities eligible as investments for First Central Insurance Company, at market value.

The parties agree that the Tax Allocation Agreement is enforceable for the period in question and governs the parties' respective rights to the Tax Refund.[4] There, however, their agreement ends. This opinion will first address whether, under the terms of the Tax Allocation Agreement, FCIC would be entitled to the entire amount of the Tax Refund, as the Superintendent contends. This opinion will next address whether, under the terms of the Tax Allocation Agreement, FCFC

holds all or any portion of the Tax Refund in trust for FCIC, or whether the beneficial interest in the Tax Refund is property of FCFC's estate, so that FCIC simply has a claim against FCFC.

**B.** *Is FCIC Entitled to the Entire Amount of the Tax Refund Under the Tax Allocation Agreement?*

The Superintendent contends that FCIC is entitled to the full amount of the Tax Refund because, among other things, FCIC supplied all of the funds which paid the Group's taxes for the pertinent tax years. *See, e.g., White Metal Rolling,* 222 B.R. at 424 (finding that in the absence of a tax allocation agreement, a subsidiary which paid the tax and incurred the loss was entitled to the refund). The Trustee disagrees, contending that FCIC is *not* entitled to the full amount of the Tax Refund, because the Tax Allocation Agreement limits FCIC's interest in any tax refund to the right to receive from FCFC an amount equal to the tax refund FCIC would have been entitled to receive from the I.R.S. if its taxes had been calculated on a stand-alone basis. This argument is based upon the first sentence of paragraph A of the Tax Allocation Agreement:

> The tax charge or refund to First Central Insurance Company under this Agreement shall be an amount that First Central Insurance Company would have paid or received if it had filed on a separate return basis with the Internal Revenue Service.

The Superintendent takes the position that, although FCIC did not have losses in 1994 and 1995, FCIC sustained substantial losses in 1997 which would be sufficient to generate the Tax Refund under the carry-

---

4. The Superintendent asserts that the Tax Allocation Agreement was executed in 1985. Although the Trustee disclaims knowledge of the date of execution, he agrees that the Tax

Allocation Agreement was in effect during the tax years in question, *i.e.,* 1993 and thereafter. (Doc. 20 at 4; Doc. 22 ¶ 2.)

back provisions of the I.R.C. had FCIC's taxes been calculated in a stand-alone basis. Accordingly, the Superintendent argues, FCIC is entitled to the entire Tax Refund even if the Trustee's interpretation of the Tax Allocation Agreement is accepted.

The Trustee, on the other hand, contends that FCIC would not have received a tax refund in the magnitude of the Tax Refund if it had filed its tax returns on a stand-alone basis for the period in question because the alternative minimum tax ("AMT") rate was applicable to the Group's final tax liability for the taxable years of 1993, 1994, and 1995, and would have been applicable to FCIC's tax liability for those years if it had filed on a separate return basis.

The AMT provisions were enacted as a part of the Tax Reform Act of 1986. 26 U.S.C. §§ 55–59; *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1314 (Fed.Cir.2000); *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 170 Misc.2d 15, 647 N.Y.S.2d 322, 325 (N.Y.Sup.Ct.1996). The AMT is directed at taxpayers with substantial earnings but who had paid little or no tax because they were able to structure their transactions to eliminate a significant amount of federal income tax. *Doyon*, 214 F.3d at 1314; *Okin v. Commissioner*, 808 F.2d 1338, 1340 (9th Cir.1987); *IBM Credit*, 647 N.Y.S.2d at 325. The I.R.C., by requiring a taxpayer to pay the greater of its standard tax for the taxable year or the AMT for the taxable year, intended that a taxpayer will pay at least a minimum amount of tax at a prescribed statutory rate despite creative tax planning. 26 U.S.C. § 55; *Doyon*, 214 F.3d at 1314–15; *Okin*, 808 F.2d at 1338.

Most importantly, the AMT is a nonrefundable tax. (Doc. 24 ¶ 32.) Thus, even where (as in this case) substantial losses are carried back to prior tax years

to generate a tax refund, the amount of any such tax refund is limited to the difference between the taxes paid initially at the standard rate (a refundable tax) and the taxes for the relevant years calculated at the AMT rate (a non-refundable tax). Thus, the application of the AMT reduces the amount of tax refund that a taxpayer would otherwise be eligible to receive.

The Group's consolidated federal income tax returns for 1993, 1994, and 1995, as originally filed, reported and paid each year's taxes based upon the standard tax for the taxable years. (Doc. 24 at ¶ 22). When FCFC and FCIC carried back their 1996 and 1997 losses to offset the Group's income earned in 1993, 1994, and 1995, the Group was required to recalculate its consolidated taxes payable those years to reflect the reduced taxable income. Taking the loss carryback deduction into account, the Group calculated that its tax liability under the AMT rate exceeded its tax liability under the standard tax rate. Therefore, it is uncontested that the Group's final tax liability for 1993, 1994 and 1995 was the AMT. (Doc. 24 ¶ 30.) When the necessary calculations are performed to determine what FCIC tax liability would have been if it had filed on a stand-alone basis for 1993, 1994 and 1995, it becomes apparent that FCIC would also have been subject to the AMT if it had filed its tax returns on a stand-alone basis for those years. (Doc. 24 ¶ 32.)

Based upon calculations performed by the Trustee's accountant, it appears that, as a result of the application of the AMT, FCIC's tax liability for the tax years of 1993, 1994 and 1995, calculated on a stand-alone basis, would have totaled, in the aggregate, at least $1,053,148. Because AMT is a non-refundable tax, FCIC's 1996 and 1997 losses could not be carried back to reduce its tax liability below the AMT. The actual tax liability for the Group for

1993, 1994 and 1995, however, was $553,016, because the Group's AMT liability was reduced by losses incurred by FCFC during those years (in which FCIC had no losses). (Doc. 24 ¶ 33.) The amount of the Tax Refund represents taxes previously paid by the Group less the Group's actual tax liability for 1993, 1994 and 1995, calculated at the AMT rate. Thus, if FCIC were to be paid the entire Tax Refund, it would receive at least $500,132 more than it would be entitled to receive had it filed its tax returns on a stand-alone basis (*i.e.*, the difference between FCIC's stand-alone AMT liability for the period (at least $1,053,148) and the Group's AMT liability for the period ($553,016)). (Doc. 24 ¶ 33.) It is therefore apparent that FCIC would not have been entitled to the entire amount of the Tax Refund had it filed its tax returns on a stand-alone basis.

The Superintendent does not controvert the Trustee's assertions regarding the effect of the AMT on the Group's tax liability for the period, or concerning the amount of AMT that would be owed by FCIC for the period if its taxes had been calculated on a stand-alone basis. Instead, he dismisses those facts as irrelevant, based upon several arguments.

First of all, the Superintendent relies upon paragraph B of the Tax Allocation Agreement, which provides that, "[t]he tax charge to [FCIC] shall not be more than it would have paid if it had been filed on a separate return basis." The Superintendent argues that the quoted provision from paragraph B shows that the intent of the Tax Allocation Agreement was that FCIC cannot be required to pay more in taxes than it would pay on a separate return basis, but it may, through the use of FCFC's tax attributes, pay less. (Doc. 30 at 7.) Therefore, according to the Superintendent, it follows that the Tax Allocation

Agreement cannot be interpreted to mean that FCIC's rights to the proceeds of refunds received by the Group is limited to the amount it would have received if it had filed on a stand-alone basis (notwithstanding the clear language to that effect in paragraph A).

This argument fails because the quoted language of paragraph B of the Tax Allocation Agreement simply does not support it, for several reasons. First, the language in question does not address the parties' respective entitlement to tax refunds; entitlement to refunds is addressed only in paragraph A. Second, the quoted language in paragraph B is not inconsistent with the provision of paragraph A of the Tax Allocation Agreement, which provides that "[t]he tax charge or refund to [FCIC] under this Agreement shall be in an amount that [FCIC] would have paid or received if it had filed on a separate return basis with the [I.R.S.]." Inconsistency would arise only if paragraph A provided (which it does not) that the tax charge to FCIC will be *greater than* the amount FCIC would be required to pay on a separate return basis.

The Superintendent also argues that giving effect to the first sentence of paragraph A of the Tax Allocation Agreement would be inconsistent with the principal purpose of the Agreement, which, according to the Superintendent, is revealed by Circular Letter No. 33 ("Circular") issued by the Superintendent dated December 20, 1979, which sets forth guidelines for tax allocation agreements between domestic insurers and their affiliates. (Doc. 1 Ex. C.) The Superintendent argues that FCFC and FCIC entered into the Tax Allocation Agreement in order to comply with the Superintendent's Circular, as reflected by the fact that the relevant portions of the Tax Allocation Agreement are virtually identical to the guidelines contained in the

Circular. According to the Superintendent, the principal purpose of the Agreement, as shown in the Circular, is "to assist domestic insurers in maintaining their fiscal integrity" and "to be fair and equitable, and to give appropriate recognition to the separate operating identity of the insurer." (Doc. 30 at 7–8.) It would defeat this purpose, says the Superintendent, to allow FCFC to receive any portion of the Tax Refund, even if FCIC would not have been entitled to the full amount of the Tax Refund if it had filed on a separate return basis, because to do so would be allowing FCFC to "take cash from FCIC for FCFC's benefit." (Doc. 30 at 8.) This is so, according to the Superintendent, because FCIC funded the payment of all of the Group's taxes for the years in question.

The parties disagree about whether the Circular is admissible to show the parties' intentions in entering into the Tax Allocation Agreement. The Trustee contends that the Circular is extrinsic and parol evidence which may not be introduced "to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *International Multifoods Corp. v. Commercial Union Ins. Co.*, 98 F.Supp.2d 498, 503 (S.D.N.Y. 2000). The Superintendent, while conceding that "a circular letter is not a rule or regulation and is purely advisory in nature," reflecting the Insurance Department's interpretation of statutes, argues that the Circular is evidence of the "legal backdrop against which the Tax Allocation Agreement was executed," and is admissible to show why the Tax Allocation Agreement was entered into, and to show that the Trustee's interpretation is unreasonable in light of the overriding purpose of the Tax Allocation Agreement. (Letter of William Purcell to the Court dated April 6, 2001; Transcript of the Hearing dated April 4, 2001 at 5, 7.)

It is unnecessary to resolve this issue, however, because even if (as the Superintendent contends) the purpose of the Tax Allocation Agreement is to insure that FCIC maintains its "fiscal integrity" and "separate operating identity," this purpose is in no way undermined by requiring FCIC to pay taxes and receive refunds in the amount it would have paid and received if it had filed on a stand-alone basis (as the first sentence of paragraph A provides). Indeed, the Superintendent's assertion that allowing FCFC to retain any portion of a refund of taxes funded by FCIC subverts the purpose of the Agreement by "allowing FCFC to take cash from FCIC for FCFC's benefit" is difficult to square with the language of the Circular.

First of all, the Circular contains, paragraph 3A, the precise language which is incorporated in paragraph A of the Agreement (and which the Superintendent seeks to read out of the Agreement). Second, in paragraph 3A, the Circular mandates that an escrow fund be set up for tax overpayments by the insurance subsidiary (resulting when it pays the holding company in the amount that would have been required to pay in taxes on a stand-alone basis and the consolidated group pays taxes to the I.R.S. in a lesser amount). Under this provision, which was also incorporated in the Tax Allocation Agreement, the overpayments are to be held until the period for loss carrybacks has expired, at which time the overpayments may be released from the escrow fund *to the parent*. If the Superintendent were correct that it offends the purpose of the Agreement to permit FCFC to retain any monies paid in taxes by FCIC, this provision (which appears in the Circular as well as in the Tax Allocation Agreement) would require escrow funds to be returned to the insurance subsidiary upon the expiration of the loss carryback period. Instead, the Circular,

and the Agreement, expressly permit such funds to be released "to the parent."

Accordingly, this Court concludes that, under the terms of the Tax Allocation Agreement, FCIC is not entitled to receive from FCFC the entire amount of the Tax Refund, but only an amount which is equal to the amount of the tax refund that FCIC would have received from the I.R.S. if its taxes had been calculated on a stand-alone basis. Based upon FCFC's uncontroverted evidence concerning the application of the AMT to the parties' tax liabilities, this Court further concludes that FCIC would have been entitled to receive an amount which is less than the amount of the Tax Refund from the I.R.S. if its tax liability had been calculated on a stand-alone basis.

### C. Is FCIC Is a Trust Beneficiary or an Unsecured Creditor with Respect to the Amounts Due to It Under the Tax Allocation Agreement?

■ If FCFC is a trustee or an agent for FCIC with respect to the refund payments due to FCIC under the Tax Allocation Agreement, such that FCFC holds only bare legal title to such funds, then, under § 541(d) of the Bankruptcy Code, the beneficial interest in the portion of the Tax Refund that FCIC is entitled to under the Tax Allocation Agreement is not property of the estate. On the other hand, if, as the Trustee contends, FCFC and FCIC stand in a debtor-creditor relationship with respect to any refund payment due and owing from FCFC under the Tax Allocation Agreement, the beneficial interest in the Tax Refund is property of the estate.

A number of Courts have been called upon to analyze the distinction between a trust and a debt in bankruptcy. In performing this analysis, courts focus on, among other things, whether the alleged trust funds are required to be segregated. *E.g., Fox v. Shervin (In re Shervin),* 112

B.R. 724, 734 (Bankr.E.D.Pa.1990) ("It is understood that when the 'trustee' of the funds is entitled to use them as his or her own and commingle them with his or her own money, a debtor-creditor relationship exists, not a trust"); *Dampskibsselskabet Af 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes, Inc.),* 35 B.R. 830, 836 (Bankr.S.D.N.Y.1984) ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists" (collecting cases)).

A detailed analysis of this distinction is illustrated in *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981), where the court found that a debtor-creditor relationship, rather than a trust relationship, existed between plaintiff airline and debtor travel agency, despite language in the agreement between the travel agency and the airline which provided that the funds collected by the travel agency were to be held in trust by the travel agency for the airline. Facts that convinced the court that (notwithstanding the "talismanic" invocation of trust language) the "relationship remained in practical fact that of debtor-creditor" were (1) the contract did not require the travel agency to keep the proceeds of the carrier's ticket sales separate from any other funds and (2) no restriction was placed upon the travel agency's use of the supposed trust funds. *Id.* at 1071. The court concluded that "[i]n the absence of any provision requiring [the travel agency] to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label 'trust' could in these circumstances and for present purposes have no legal effect." *Id.* The court noted that its conclusion was buttressed by the fact that the travel agency was required to pay the carrier the price of tick-

ets sold whether it received the funds from customers or not, and that the proceeds were to be turned over at specified regular intervals, rather than on receipt or on demand. *Id.* at 1072.

In *Pan Am. World Airways, Inc. v. Shulman Transp. Enter., Inc. (In re Shulman Transp. Enter., Inc.)*, 744 F.2d 293 (2d Cir.1984), the Second Circuit, following *Morales*, and interpreting the same form of agreement, rejected a carrier's argument that its agreement with the debtor travel agency created a principal-agent relationship, such that the funds collected by the travel agency were property of the carrier. The court found that the absence of any requirement that the travel agency segregate the funds in question or any provision restricting their use showed that the travel agency was not subject to the carrier's direction and control, and was therefore not acting as its agent in respect of the handling of monies collected. *Id.* at 295. Other factors found by the court to contra-indicate a principal-agent relationship was the fact that the agreement did not require the travel agency to obtain approval from the principal before extending credit or taking legal action to recover from defaulting customers. *Id.* at 295–96. In addition, the court noted that the agreement made the travel agency responsible for the payment of monies due the carrier whether or not the money had been collected from the shipper, and that monies collected by the travel agency from a delinquent shipper after the travel agency had paid the bill to the carrier would belong to the travel agency, not to the carrier. *Id.* at 296.

Applying the principles outlined in *Morales* and *Shulman* to the uncontested facts of this case leads to the conclusion that FCFC is indebted to FCIC in respect of amounts which FCIC is entitled to receive from FCFC under the Tax Allocation Agreement, and that FCFC does not hold those monies as trustee for, or as agent of, FCIC. First of all, as discussed above, the Tax Refund in its entirety is clearly not property of FCIC, because under the terms of the Tax Allocation Agreement, FCIC is only entitled to the amount it would have obtained as a tax refund if it had filed its returns on a stand-alone basis, which is an amount less than the Tax Refund. Nor does the Tax Allocation Agreement provide that FCFC holds any portion of the Tax Refund in trust for FCIC or contain any language even purporting to create such a trust. Although the Tax Allocation Agreement does provide that payments made by FCIC that are not used to pay the Group's taxes shall be placed in escrow until the applicable loss carryback period has expired, there is no similar provision requiring tax refunds received by FCFC (or even FCIC's portion thereof) to be placed in escrow. Moreover, with respect to the tax "overpayments" by FCIC which are required to be placed in escrow, it does not appear that those amounts are held in trust for FCIC, given that the funds are to be paid to FCFC, not FCIC, at the expiration of the applicable carryback period.

Thus, there is no requirement that FCFC segregate any refund payment due to FCIC under the Tax Allocation Agreement from its general funds, nor any restriction upon FCFC's use of such funds. The Agreement does not restrict how the refund monies may be used or invested by FCFC during the 30 days between the time that the monies are received by FCFC and the time that settlement with FCIC is required under the Tax Allocation Agreement; it merely requires that the ultimate settlement payment to FCIC be made in cash or securities eligible for investment by FCIC.

██ Nor does the Tax Allocation Agreement contain any language creating an agency relationship. "An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Shulman Transp.*, 744 F.2d at 295. Under the Agreement, FCFC does not act at FCIC's direction and control, either in applying for a tax refund, or in the handling of the refund monies once received. Although the Tax Allocation Agreement does not require FCFC to make payment to FCIC prior to receiving a refund from the I.R.S., the mere fact that FCFC is not taking this collection risk does not, in the absence of other indicia of a trust or agency relationship, transform FCFC into a trustee or agent for FCIC.

This conclusion is buttressed by the analysis of a similar tax allocation agreement in *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9 (Bankr.D.Kan.1993). There, as in the instant case, a bankruptcy court was required to construe a tax allocation agreement between a holding company and its operating subsidiary to determine the ownership of a tax refund paid by the I.R.S. to the holding company, as parent of the consolidated group. There, as in this case, the refund arose from the carryback of net operating losses reported by the consolidated group, and resulted entirely from taxes paid by the operating subsidiary. The Resolution Trust Corporation, as conservator of the operating subsidiary, claimed ownership of the entire tax refund, under the tax allocation agreement and under a theory of constructive trust.

The court rejected both claims, finding that the agreement between the parties, which provided for "reimbursement" and "credit" to the subsidiary in the amount of any refund due to it, was inconsistent with the subsidiary's claim of ownership. Focusing on the word "reimbursement" in the tax allocation agreement, the court reasoned as follows:

> The use of this term is consistent with a "debt" or "receivable," rather than with ownership. If the parties considered the refund to be property of [the subsidiary], they could have provided for its "return" to [the subsidiary]. The parties' selection of terms indicates that they intended the obligation to be in the nature of a receivable.

*Id.* at 29.

The court also rejected the subsidiary's claim that a constructive trust should be imposed on the tax refund, finding that the tax agreement, which (as in this case) required the subsidiary to pay only its stand-alone liability, did not represent overreaching by the parent so as to justify imposition of a constructive trust.

Here, as in *Franklin*, the language of the Tax Allocation Agreement does not support FCIC's claim of ownership of the Tax Refund. Paragraph C of the Tax Allocation Agreement provides

> [w]here a refund is due, First Central Financial Corp. may defer payment to First Central Insurance Company to within thirty (30) days of receipt of such refund. All settlements shall be made in cash or securities eligible as investments for First Central Insurance Company, at market value.

The "refund" referred to in the quoted first sentence is a refund from the I.R.S. to the Group (not a refund from FCFC to FCIC). This is apparent from the reference to receipt by FCFC of "such refund." Thus, the Tax Allocation Agreement contemplates that within 30 days of receipt by FCFC from the I.R.S. of any refund due to the Group, any payment due to FCIC under the Tax Allocation Agreement will be made by FCFC. This provision is consistent with a debtor-creditor relationship,

as are the preceding and following sentences, which both provide for "settlements" between the parties under the Agreement. *Green v. Disbrow*, 79 N.Y. 1 (1879) ("Where there are mutual accounts between two persons, it is always the understanding that the account upon one side shall offset that upon the other, and in law the debt due from the one to the other is only the balance left after the application in reduction of the accounts on the opposite side.... The very theory upon which this statute is based is that the credits are mutual and that the account is permitted to run with the view of ultimate adjustment by a *settlement* and *payment* of the balance") (emphasis added); *Rodgers v. Roulette Records, Inc.*, 677 F.Supp. 731, 735 (S.D.N.Y.1988) (citing *Green v. Disbrow*, noting that an open, mutual account "is permitted to run with a view of ultimate adjustment by a settlement and payment of the balance"). Accordingly, not only is the Agreement devoid of any language purporting to create a trust or agency relationship, it contains language which shows an intent to create ordinary contractual obligations between the parties, *not* a fiduciary relationship.

The Superintendent seeks to read into the Agreement the words "of such refund" after the word "payment" in the portion of paragraph C of the Tax Allocation Agreement referred to above. Thus, according to the Superintendent, the key provision of the Tax Allocation Agreement should be read as follows:

> Where a refund is due, First Central Financial Corp. may defer payment [of such refund] to First Central Insurance Company to within thirty (30) days of receipt of such refund.

The problem with this argument is that, first of all, that is not what the Tax Allocation Agreement says. Second, if the provision is read to include the bracketed language, the effect would be that *all* tax refunds received by the Group from the I.R.S. belong to FCIC, regardless of the source of the monies, and regardless of the amount FCIC would have been entitled to receive absent consolidation. This is obviously not the intended result of the Agreement, which expressly provides that FCIC is entitled to the refund amount it would have received if it had filed on a stand-alone basis. Thus, the only rational interpretation of this paragraph is that "payment" in the quoted paragraph refers to the payment required to be made by FCFC to FCIC under the Agreement, and does not mandate the automatic payment to FCIC of any tax refund received by FCFC on behalf of the Group.

### D. *Course of Performance*

■■■■ Generally, "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4) comment g (1981); *see Quick v. National Labor Relations Bd.*, 245 F.3d 231, 247 (3d Cir.2001). However, self-serving conduct is not entitled to weight. Restatement (Second) of Contracts § 202(4) comment g (1981).

The Superintendent argues that the course of performance between FCFC and FCIC indicates that both companies believed that the Tax Refund was FCIC's property under the Tax Allocation Agreement. When FCFC received past tax refunds for the Group, with the exception of the Tax Refund at issue, it consistently paid the entirety of the funds to FCIC. Moreover, argues the Superintendent, there is no evidence that FCFC ever asked FCIC to prepare stand-alone tax computa-

tions or otherwise to justify its entitlement to those tax refunds.

Thus, the Superintendent contends that the parties' course of performance shows that under the Agreement all tax refunds received by the Group were to be property of FCIC, whether or not FCIC would be entitled to receive such an amount if its taxes had been calculated on a stand-alone basis. This Court disagrees.

Both the Superintendent and the Trustee agree that Martin J. Simon ("Simon"), the president and chief executive officer of FCFC and FCIC, engaged in pervasive self-dealing in connection with the operation of both companies, as detailed in the Insurance Department Report. Simon and other individuals who served as officers and directors of both parent and subsidiary are alleged to have dominated FCFC and FCIC, to have failed to observe corporate formalities, and to have operated the companies only to further their own self interest. (Doc. 21 Ex. B; Doc. 33 Ex. A). Under those circumstances, the past practices of FCFC and FCIC in connection with the handling of tax refunds cannot be given weight in the interpretation of the Tax Allocation Agreement. Restatement (Second) of Contracts § 202(4) comment g (1981).

■ Moreover, even where the conduct in question is not self-serving, and therefore is entitled to weight in the interpretation of an agreement, the "[c]onduct must be weighed in light of the terms of the agreement and their possible meanings." *Id.* Here, the terms of the Tax Allocation Agreement clearly provide the manner in which refund payments to be made to FCIC under the Agreement are to be calculated. Past practices cannot be relied upon (as the Superintendent urges) to give a meaning to the Tax Allocation Agreement which is at odds with "the terms of the agreement and their possible meanings." *Id.*

## II. Whether Any Portion of the Tax Refund Is Subject to a Constructive Trust in Favor of FCIC

■ "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 360 (2d Cir.1999), (citing, *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)). "Where the debtor's conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions." *Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88, 93 (2d Cir. 1989). A constructive trust is a potent remedy because it confers upon the true owner of the property an equitable interest in the property superior to that of the trustee's. *Koreag, Controle Et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag, Controle Et Revision S.A.),* 961 F.2d 341, 352 (2d Cir.1992); *Howard's Appliance,* 874 F.2d at 93. Thus, the successful claimant has priority over the debtor's unsecured creditors to the extent of the property subject to the trust. *Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.),* 12 F.3d 426, 436 (5th Cir.1994).

■ For this reason, the remedy of constructive trust is generally disfavored in bankruptcy. *E.g., Haber Oil,* 12 F.3d at 436 ("Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy

**500**

Code, bankruptcy courts are generally reluctant 'to impose constructive trusts without a substantial reason to do so'" (citations omitted)); *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443, 1451 (6th Cir.1994) ("A constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code" (citations omitted)).

■■■■■ The burden of establishing the existence of a constructive trust rests on the claimant. *Haber Oil,* 12 F.3d at 436. Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relation; (2) a promise, expressed or implied; (3) a transfer in reliance on that promise; and (4) unjust enrichment. *Counihan,* 194 F.3d at 361–62 (citing *Sharp v. Kosmalski,* 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976)); *Koreag,* 961 F.2d at 352. The Second Circuit held that "[a]lthough these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited'," and that "that the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity." *Koreag,* 961 F.2d at 352–53. The Second Circuit reaffirmed its support for this position in *Counihan,* stating that "[c]ourts do not insist that a constructive trust must fit within the framework of these elements." *Counihan,* 194 F.3d at 362. Accordingly, the lack of a fiduciary relationship between the parties does not automatically defeat the claimant's claim for a constructive trust. *Koreag,* 961 F.2d at 354. The key factor under New York law is unjust enrichment, not willfully wrongful conduct, and innocent parties may be unjustly enriched. *Koreag,* 961 F.2d at 354; *Counihan,* 194 F.3d at 361 ("[u]njust enrichment does not necessarily implicate the perfor-

mance of a wrongful act"). Unjust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain. *Counihan,* 194 F.3d at 361.

■■■■ The Superintendent argues a constructive trust should be imposed on the Tax Refund because FCFC's bankruptcy estate would be unjustly enriched if it was allowed to retain the Tax Refund, which is comprised of taxes paid solely by FCIC. (Doc. 30 at 16–17.) The Trustee contends that there is no basis for a trust, constructive or otherwise, and that imposition of a constructive trust on any payment due and owing to FCIC under the Tax Allocation Agreement would improperly permit the Superintendent to circumvent the Bankruptcy Code's equitable system of distribution by leapfrogging over FCFC's other creditors. (Doc. 33 at 12.)

In the absence of a tax allocation agreement, the Superintendent might be correct that retention of the Tax Refund would unjustly enrich the bankruptcy estate of FCFC. *See, e.g., Bob Richards,* 473 F.2d at 265; *White Metal Rolling,* 222 B.R. at 424. However, FCFC and FCIC did enter into the Tax Allocation Agreement, which governs their respective rights and responsibilities. No allegation is made by the Superintendent that FCFC acted unfairly, overreachingly, or unconscionably in the creation or implementation of the Tax Allocation Agreement. *Cf. Franklin,* 159 B.R. at 30 (where such an allegation was made). Indeed, as the Superintendent has pointed out, much of the Tax Allocation Agreement, including the provisions relevant to this dispute, is taken *verbatim* from the Superintendent's Circular. Thus, in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the Tax Allocation Agreement, the Agreement will be given effect, and

there is no basis for imposing a constructive trust on the Tax Refund. *Franklin,* 159 B.R. at 33; *White Metal Rolling,* 222 B.R. at 423.

The Superintendent, rather than supporting his argument with cases that apply New York's constructive trust law, relies primarily on cases that apply federal common law to establish a constructive trust. In *Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.),* 997 F.2d 1039, 1056 (3d Cir.1993), the Third Circuit, applying federal common law, found that refunds created by order of the Federal Energy Regulatory Commission ("FERC"), which the debtor, the owner of a natural gas pipeline, was required by federal law to remit to the debtor's customers, were not property of the estate. In *United States v. McConnell (In re Flying Boat, Inc.),* 258 B.R. 869, 872 (N.D.Tex.2001), the court also applied federal common law to determine that certain fees, prescribed by federal law, which the debtor was required to collect from passengers in connection with airline ticket sales and to remit to the Immigration and Naturalization Service, were not property of the debtor's estate. *Cf. T & B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir.1989) (funds deposited in segregated account maintained for the benefit of contractor's materialmen were held not property of the contractor's estate).

These cases are inapposite for several reasons. First of all, in *Columbia Gas* and *Flying Boat,* federal common law, rather than New York law, supplied the rule of decision. As both of those courts pointed out, federal common law generally provides a more expansive definition of implied trust than does state law. *Columbia Gas,* 997 F.2d 1039, 1056; *Flying Boat,* 258 B.R. 869, 872. There has been no contention that federal common law is applicable in the instant case, and indeed it is not.

Application of federal common law is the exception rather than the rule. *Columbia Gas,* 997 F.2d at 1055. In determining whether federal common law should supply the rule of decision, the court must consider: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. *Columbia Gas,* 997 F.2d at 1055; *Flying Boat,* 258 B.R. at 872. The Tax Allocation Agreement at issue pertains exclusively to state law policies regarding the regulation of its insurance companies, and therefore none of the prongs are satisfied. New York law, not federal common law, is applicable in this case.

Second, in each of the cases cited above, the debtor functioned merely as a conduit, required by statute (or, in the case of *T & B Scottdale,* by contract) to receive the funds in question and remit them to the intended recipient. Here, FCFC did not function merely as a conduit for the Tax Refund from the I.R.S. to FCIC. FCFC was not required by the Tax Allocation Agreement to remit the Tax Refund to FCIC, but only to pay to FCIC an amount equal to the refund FCIC would have received if it had filed its tax returns on a stand-alone basis.

Although in both *Columbia* and *Flying Boat,* a constructive trust was imposed notwithstanding the commingling of the claimed trust funds with the debtor's general revenues, this reflects both the more expansive scope of constructive trust under federal law, as well as the courts' conclusion that because of the impractica-

502

bility of segregating the funds in question, commingling was to be given little weight. *Columbia Gas,* 997 F.2d at 1060; *Flying Boat,* 258 B.R. at 874–75. Here, by contrast, New York law, not federal common law, supplies the rule of decision, and there is no allegation that it would have been administratively burdensome or impracticable for FCFC to segregate the funds due to FCIC under the Tax Allocation Agreement.

Thus, for these reasons, this Court finds that neither the Tax Refund, nor any portion thereof, is held in constructive trust by FCFC for FCIC.

### Conclusion

For all of the foregoing reasons, the Tax Refund is property of FCFC's bankruptcy estate under § 541 of the Bankruptcy Code. Accordingly, the Superintendent's motion for summary judgment is denied and the Trustee's cross motion for summary judgment is granted. The foregoing is without prejudice to any claim consistent with this ruling that the Superintendent may assert as a creditor in this bankruptcy case, and without prejudice to any objection that may be interposed by the Trustee to any such claim. The Trustee is directed to settle an order consistent with this decision.